41 So.3d 857 (2010)
Alan Lyndell WADE, Appellant,
v.
STATE of Florida, Appellee.
No. SC08-573.
Supreme Court of Florida.
May 6, 2010.
Rehearing Denied August 4, 2010.
*862 Frank J. Tassone, Jr. and Rick Sichta of Tassone and Sichta, LLC, Jacksonville, FL, for Appellant.
Bill McCollum, Attorney General, and Meredith Charbula, Assistant Attorney General, Tallahassee, FL, for Appellee.
PER CURIAM.
Alan Lyndell Wade was convicted of two counts of first-degree murder, two counts of kidnapping, and two counts of robbery in the July 2005 murders of Carol and Reggie Sumner. In accord with the jury's recommendation, the trial court sentenced Wade to death for each murder. In this appeal, Wade challenges his convictions and sentences. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. For the reasons explained below, we affirm.

I. BACKGROUND
In August 2005, Alan Wade, Michael Jackson, Tiffany Cole, and Bruce Nixon were indicted on two charges each of first-degree murder, armed kidnapping, and armed robbery in the murders of Carol and Reggie Sumner, a retired couple residing in Jacksonville, Florida. Pursuant to a plea agreement, Nixon pleaded guilty to two counts of second-degree murder in exchange for his cooperation with the State and his testimony against his three codefendants at their separate trials. Nixon was sentenced to concurrent sentences of forty-five years. At the time of Wade's trial, Jackson had been convicted and sentenced to death. See Jackson v. State, 18 So.3d 1016 (Fla.2009), cert. denied, ___ U.S. ___, 130 S.Ct. 1144, ___ L.Ed.2d ___ (2010). Following Wade's trial, Cole too was tried and sentenced to death.

A. Guilt Phase
At Wade's trial, the evidence established the following. At the time of the murders, Wade had known codefendant Jackson for at least a year. In the summer of 2005, Wade had visited and partied with Jackson and his girlfriend Cole in South Carolina. In June, Wade arrived at his longtime friend Nixon's home in Jacksonville, driving a Mazda RX-8 that Cole had rented in South Carolina. Wade told Nixon of a vague plan to rob someone but offered no *863 specifics. The next time Wade contacted Nixon was two evenings before the July 8 murders. Wade called and asked whether Nixon would like to join him, Jackson, and Cole in digging a hole. Nixon agreed and purloined four shovels from his neighborhood before his three codefendants appeared at his home in the Mazda.
The foursome drove around before deciding on a good location for the holea remote, wooded area located just across the state line in Georgia. Leaving the car parked on the road, the foursome hiked into the woods, where the three men dug a large, deep hole, while Cole held a flashlight. When the group returned to the car, Wade asked Jackson whether Nixon could join their robbery plan, and Jackson agreed. The group then went to Wade's house but left when Wade's mother ordered Jackson out of her home. She considered Jackson a bad influence on her son.
Over the next two days, the four codefendants moved forward with the plan to rob and kill the Sumners. Cole drove Nixon, Jackson, and Wade by the Sumners' Jacksonville home and called the Sumners on her cell phone. Cole knew the victims from when she and they had lived in South Carolina, and Jackson knew them through Cole. Both Reggie and Carol Sumner were sixty-one and in extremely poor health. The Sumners were chosen as victims because of their vulnerability and the belief that they had considerable financial resources. The four codefendants planned to gain entry to the Sumners' house while the couple was at home and obtain information regarding their financial accounts and the means to access those accounts. Jackson said that he would kill the victims with a lethal injection of medication. He promised his codefendants that they would share the money obtained from the Sumners' accounts and that each would get about $50,000.
The codefendants made preparations to effect their plan. Shortly after midnight on July 7, 2005, Jackson, Cole, and Wade went to Wal-Mart and purchased disposable rubber gloves. Then, at about 8:30 on the evening of the murders, all four codefendants went to an Office Depot, where Cole purchased duct tape and a large roll of plastic wrap. Finally, they obtained a toy gun that shot plastic pellets.
At approximately 10 p.m. on July 8, 2005, Cole drove her three codefendants in the Mazda to the Sumners' home. She and Jackson remained in the car after dropping Wade and Nixon near the home. Wade had the duct tape in his waistband, and Nixon had the toy gun. As Wade and Nixon approached the victims' house, the pair donned plastic gloves. When Carol Sumner opened the door, they asked to use her phone, and she invited them in. Upon entering, Wade quickly pulled out the phone line, while Nixon pointed the toy gun at the couple. Wade grabbed Mr. Sumner around the neck and pushed him down into a chair. They told the couple that they wanted bank and credit cards. Mrs. Sumner began to cry and pleaded with Wade and Nixon not to hurt her and her husband. Nixon took the Sumners into the spare bedroom, where he used duct tape to secure their legs and hands and to cover their mouths and eyes. Jackson then entered the home after being signaled that the victims were secured, and he and Wade began searching for financial information. A pile of mail and financial statements and Reggie Sumner's coin collection were taken to the Mazda.
At Jackson's direction, Wade and Nixon walked the Sumners out to their own Lincoln Town Car and put the couple in its trunk. According to plan, the two cars headed for the predug grave, making only *864 one stop to put gas in the Lincoln. After arriving near the gravesite, Jackson opened the Lincoln's trunk and began screaming when he saw that the victims had worked their way out of the duct tape. The couple lay with their eyes uncovered and hugging each other in the trunk. Jackson ordered Nixon to bind them again. Then, when Wade was unable to back the Lincoln up to the edge of the grave, Nixon did so. Jackson then sent Nixon to wait with Cole at the road, where she had remained with the Mazda.
Later, Wade and Jackson drove the Lincoln up to the road where Cole and Nixon waited. Jackson held a yellow legal pad and reported that it contained the previously unknown personal identification numbers (PINs) for the Sumners' bank cards. Then, with Wade and Nixon in the Lincoln and Jackson and Cole in the Mazda, the foursome drove to Sanderson, Florida, where they abandoned the Lincoln after wiping it clean of prints. They left the four shovels in its trunk.
All four codefendants then returned to Jacksonville in the Mazda. They went to an automated teller machine (ATM), where Jackson withdrew money from one of the Sumners' accounts, and then the group went to their hotel. Subsequently, Wade and Cole went to Wal-Mart, where they purchased gloves and bleach. They also returned to the Sumners' home and stole the computer. Nixon stayed with his codefendants another day and then went home. Wade, however, stayed with Cole and Jackson and traveled with them to Charleston, South Carolina. There, Cole rented two hotel roomsone for her and Jackson and the other for Wade.
Carol Sumners' daughter reported her inability to contact the couple to the Jacksonville Sheriff's Office on July 10, and the next day the couple was reported missing and a "BOLO" issued for the couple's car. On July 12 the car was found, and the law enforcement investigation of the Sumners' financial accounts revealed an unusual number of recent ATM withdrawals. Video from the ATMs revealed Michael Jackson's face and a silver Mazda in the background. Wade called Nixon to inform him that the Lincoln had been found and told Nixon to "be cool." About this same time, Nixon went to a keg party. There, while intoxicated, Nixon told a friend that he had buried someone alive and showed his wallet containing about $200 in $20 bills.
Posing as Reggie Sumner, Jackson contacted Jacksonville law enforcement officers by phone on July 12, and he assured the homicide detective that he and his "wife" were fine. Cole, posing as Carol Sumner, made the same assurances. Jackson also reported that he was having trouble accessing the Sumners' accounts and requested the detective's help. On July 14, Jackson, Cole, and Wade were located and arrested at their South Carolina hotel, and their rooms were searched pursuant to warrants. Carol Sumner's key ring containing the keys to the Lincoln was found on the nightstand in Wade's room. In the room with Jackson and Cole, law enforcement officers found a suitcase full of the Sumners' financial records, bags of recent purchases made on the Sumners' accounts, receipts for those purchases and for purchases made earlier in Jacksonville, and other items, including the Sumners' driver licenses, credit and bank cards, and checks and check register. Notably, a check for $8,000 on the Sumners' account had been made payable to Alan Wade. Officers also searched Cole's car, a Chevy Lumina, and the Mazda, which had not been returned to the rental agency but had been recovered by law enforcement officers. In the Lumina, the officers found Reggie Sumner's coin collection, and in the Mazda, they found Wade's fingerprints on *865 one of the victims' magazines. They also found an unused roll of plastic wrap with Cole's and Jackson's fingerprints on it.
Nixon was arrested, and he took officers to the Georgia gravesite. A roll of duct tape was found there, and on the morning of July 15, law enforcement officers began excavation of the gravesite. Both victims were found fully clothed and sitting in crouched positions, with at least two feet of dirt over their heads. The medical examiner testified that both Reggie and Carol were alive in the hole before the dirt was shoveled on them. Their nostrils, mouths, throats, esophagi, and tracheae contained fine sprays of dirt, indicating that the dirt was inhaled. Both victims died of a combination of mechanical asphyxiation, as the dirt compressed their chests and abdomens, and smothering, as the dirt piled up around their heads and obstructed their noses and mouths.
Wade declined to testify in his own defense, and after inquiry, the trial court found the waiver voluntary. The jury subsequently found Wade guilty of two counts of first-degree murder, determining that they were both premeditated and committed in the course of a robbery or kidnapping or both, and of two counts each of robbery and kidnapping.[1]

B. Penalty Phase and Sentencing
During the penalty phase, two witnesses gave victim impact statements. Wade then called six witnesses to testify: Bruce Nixon, Wade's mother and older sister, the mother of one of his friends, the assistant principal from his middle school, and the former youth pastor of his church. In sum, the witnesses testified that Wade's parents divorced when he was eight and his father essentially dropped out of Wade's life. His father's absence had a negative impact on Wade's life. Wade's mother, however, took him to church regularly, and as a young boy, he was kind, smart, and well-behaved. After the divorce, however, his mother was unable to spend a lot of time with him because she worked full time to support them, and during his teens, she struggled with breast cancer. In his early teens, Wade began using drugs. When he was in sixth grade, Wade was involuntarily committed to a rehabilitation center for seventy-two hours following a drug-related incident. The police had given his mother the option of commitment in lieu of his arrest. Later, when Wade was sixteen, his mother had to withdraw him from school to avoid being arrested herself because of his truancy. The next year, because of his continued drug use and escalating disregard for his responsibilities, she kicked him out of the house as a measure of "tough love." In 2004, Wade introduced his mother to Jackson, whom she deemed a bad influence on Wade for a variety of reasons. Since his arrest for the murders, however, Wade had become a model prisoner. He earned his general equivalency diploma, read dozens of books, tutored other inmates in math, and was a mentor to others. After deliberations, the jury voted eleven-to-one to recommend a death sentence for each murder.
Subsequently, the trial court held a Spencer[2] hearing at which Wade's mother testified, as did Wade's father. Carol Sumner's daughter also testified that she did not believe the death penalty was an *866 appropriate sentence for Wade. Four other witnesses gave victim impact statements.
On March 4, 2008, the circuit court imposed sentences of death for both murders.[3] The court found the following seven statutory aggravators established beyond a reasonable doubt as to each murder: (1) Wade was previously convicted of a capital felonythe contemporaneous murder of the other victim; (2) the murder was committed in the course of a kidnapping; (3) the murder was especially heinous, atrocious, or cruel (HAC); (4) the murder was cold, calculated, and premeditated (CCP); (5) the murder was committed for financial gain; (6) the murder was committed to avoid arrest; and (7) the victim was especially vulnerable due to age or disability.
In mitigation, the court found three statutory mitigators, affording only one great weight, and twenty nonstatutory factors. With respect to the substantial domination mitigator, the court stated that the factor was "not clearly established" and entitled to little weight because "Wade alone was responsible" for bringing Nixon into the criminal scheme. Moreover, although Wade followed Jackson's instructions, no direct evidence established that Wade's "personality was subdued by" Jackson within the meaning of the mitigator. Similarly, the trial court found no direct evidence that Wade's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired. Ascribing some weight to the statutory factor, the court noted that the "evidence suggests that [Wade] knew exactly what he was doing" and was not under the influence of drugs or suffering a "mental aberration" at the time of the murders. Finally, the court ascribed great weight to the statutory mitigator of the defendant's age. Wade was eighteen when he participated in murdering the two victims.
The trial court also found a number of nonstatutory mitigating factors, ascribing each only some or little weight and finding many to be either duplicative of others or "more an argumentative conclusion than a fact." The factors, which largely relate either to Wade's home life or his behavior since his arrest, are as follows: (1) Wade's parents were divorced, and he grew up without a father (little weight); (2) Wade was raised by an absentee mother (some weight); (3) Wade was raised in a negative family setting (argumentative, little weight); (4) Wade had difficulty in school (some weight); (5) Wade lacked emotional maturity (argumentative, little weight); (6) Wade lacked parental guidance (duplicative, some weight); (7) Wade had a history of substance abuse (little weight); (8) Wade had a difficult childhood (duplicative, little weight); (9) Wade had mental health issues in his youth (little weight); (10) Wade's mother threw him out of the house when he was sixteen (little weight); (11) Wade is a model prisoner (some weight); (12) Wade desires to help others (some weight); (13) Wade has changed for the better in prison (argumentative, some weight); (14) Wade is not known as a violent person in jail and has had only one disciplinary review (duplicative, some weight); (15) Wade exhibits positive personality traits in prison (duplicative, some weight); (16) Wade now has the affection and support of his family (little weight); (17) Wade was well-behaved at trial (duplicative, some weight); (18) Wade has demonstrated a potential for rehabilitation (duplicative, some weight); (19) Wade has *867 helped others in prison and could contribute to society (duplicative, little weight); and (20) Wade would be a model prisoner with a purposeful life (duplicative, little weight).
After considering the aggravating and mitigating factors in the case, the trial court concluded that the seven aggravators "far outweighed" the mitigation and that death was the appropriate penalty.

II. ANALYSIS
In this appeal from his convictions and sentences, Wade makes the following arguments: (A) his death sentences are disproportionate to codefendant Nixon's sentences, and the trial court erred in sentencing Wade to death without considering Nixon's sentence; (B) the prosecutor made statements during closing arguments in both phases of trial that constitute fundamental error; (C) the trial court erred in denying Wade's motion for mistrial regarding a "golden rule" violation by the prosecutor; (D) the trial court erred in denying the defense motion to preclude imposition of the death penalty under Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972); (E) the trial court erred in denying the defense motion to disallow the death penalty as a sentence because Florida does not have uniform standards for determining whether to seek the death penalty; (F) the trial court erred in dismissing potential juror Butler for cause; and (G) the death sentences are precluded by Roper v. Simmons, 543 U.S. 551, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005). We address these issues in turn below, followed by our independent review concerning the proportionality of the death sentences and regarding the sufficiency of the evidence for the murder convictions.

A. Consideration of Codefendant Nixon's Sentence
As previously stated, three of the codefendantsWade, Jackson, and Cole were sentenced to death for both murders. Although originally indicted with the others on charges of first-degree murder, Nixon pleaded guilty to the lesser charges of second-degree murder in exchange for his cooperation and truthful testimony at each of his codefendants' trials. At his sentencing, Nixon's revised sentencing scoresheet provided the court with discretion to sentence Nixon anywhere from the lowest guidelines sentenceforty-seven and one-tenth yearsto life in prison, and even to go below the guidelines based on any mitigation found by the trial court. Nixon's original scoresheet reflected a range of fifty-two years to life. The scoresheet was recalculated when the "armed" element of the kidnapping and robbery charges was deleted.
After hearing mitigation testimony at Nixon's sentencing hearing, the court imposed concurrent forty-five-year sentences for the second-degree murders. Nixon was sentenced after all three of his codefendants were tried and the juries recommended death sentences, but before Wade or Cole was sentenced.
Wade first contends that his death sentences are not proportional to codefendant Nixon's sentences for a term of years. Thus, he claims that his sentences must be commuted to life because Nixon was equally culpable for the murders. Wade's contention fails. In Shere v. Moore, 830 So.2d 56, 60 (Fla.2002), we stated that "where more than one defendant was involved in the commission of the crime," we would consider the relative culpability of the codefendants in determining the proportionality of the death sentence imposed. We deemed such analysis necessary because equally culpable codefendants should not *868 be treated differently. We have recognized, however, that "[i]n order to have that same degree of blame or fault the codefendants must, at a minimum, be convicted of the same degree of the crime." Id. at 61. Accordingly, Nixon's sentences for second-degree murder do not provide a basis for concluding that Wade's death sentences are disproportionate. Furthermore, "where the codefendant's lesser sentence was the result of a plea agreement or prosecutorial discretion, this Court has rejected claims of disparate sentencing." England v. State, 940 So.2d 389, 406 (Fla. 2006) (quoting Kight v. State, 784 So.2d 396, 401 (Fla.2001)); accord Smith v. State, 998 So.2d 516, 528 (Fla.2008), cert. denied, ___ U.S. ___, 129 S.Ct. 2006, 173 L.Ed.2d 1101 (2009).
Wade also argues that in sentencing him for the two murders, the trial court erred by not considering Nixon's "disparate" forty-five-year sentences as mitigation. This argument is not preserved for review. Although Wade was sentenced after the same court sentenced Nixon, Wade never requested that the trial court consider Nixon's sentence as mitigation of his own sentence. Wade is precluded from making this argument for the first time on appeal.

B. Fundamental Error in Closing Arguments
Wade contends that the prosecutor made a number of improper and misleading statements during the guilt- and penalty-phase closing arguments. Wade, however, did not preserve these claimed errors for review by contemporaneously objecting to them. See Brooks v. State, 762 So.2d 879, 898-99 (Fla.2000) (reiterating general rule that where an appellant does not object contemporaneously, improper closing argument comments are not cognizable on appeal unless they constitute fundamental error). Accordingly, we review each of these statements below to determine whethereither separately or cumulativelythe statements constitute error that reaches down into the validity of the trial such that a guilty verdict or death recommendation could not have been obtained without the assistance of the alleged error. See Simpson v. State, 3 So.3d 1135, 1146 (Fla.), cert. denied, ___ U.S. ___, 130 S.Ct. 91, 175 L.Ed.2d 62 (2009).

1. Alleged Error in Guilt-Phase Closing Arguments
During closing argument, the prosecutor stated that "Alan Wade chose Bruce Nixon as our witness." Wade argues that this was improper because it placed the onus on Wade for forcing the State to use Nixon as a witness. We disagree. "The proper exercise of closing argument is to review the evidence and to explicate those inferences which may reasonably be drawn from the evidence." Bertolotti v. State, 476 So.2d 130, 134 (Fla. 1985). Here, the jury was aware and the State had made it clear that Nixon was involved in these murders and testified pursuant to a plea agreement. In context, the prosecutor made the disputed remark to emphasize that it was Wade who invited his friend Nixon to join the robbery-murder scheme after obtaining Jackson's approval. Accordingly, the prosecutor's statement did not constitute improper argument but was fair comment on the evidence adduced at trial.
Wade next argues that the prosecutor improperly tried to minimize the plea agreement that Nixon made with the State and misrepresented Nixon's actual sentence to the jury. On cross-examination defense counsel questioned Nixon about his plea agreement for second-degree murder, under which the trial court could pursuant to the original scoresheetsentence *869 Nixon to a term of fifty-two years up to life for each murder. The twenty-year-old Nixon responded that he saw no "difference between getting first-degree murder and get[ting] 52 to life. . . . It's carrying the same amount of time." Then, in closing argument, the prosecutor pointed to this testimony to preempt any defense claim that Nixon was lying by pointing out that Nixon thought that under the plea agreement he would essentially get a life sentence, which "isn't really a great deal." Accordingly, the prosecutor's statement was fair comment on the evidence.
Wade also claims that because Nixon was sentenced to forty-five years in prison for the murders, the State misrepresented Nixon's potential lowest sentence to the jury. Nixon, however, was not sentenced until after Wade's penalty phase was conducted; thus, the prosecutor did not know what sentence would actually be imposed. As explained in the foregoing section, Nixon's scoresheet was revised downward at Nixon's sentencing because the "armed" element of the kidnapping and robbery charges was removed, as it was for all of the defendants in the case.
During an extended closing argument, the prosecutor separately made the following three statements: (1) "So why would this guy lie, to get that deal? To get life? That's why he's lying?"; (2) "There's no way Bruce Nixon is that bright"; and (3) "The only reason [Nixon] was involved was because he wanted money and his best friend [Wade] gave him the opportunity and he [Nixon] told the police the truth." Wade argues that these three statements constituted improper vouching.
We have previously stated that improper vouching or bolstering occurs when the State "places the prestige of the government behind the witness or indicates that information not presented to the jury supports the witness's testimony." Williamson v. State, 994 So.2d 1000, 1013 (Fla. 2008) (quoting Hutchinson v. State, 882 So.2d 943, 953 (Fla.2004)). In their context, the challenged statements of the prosecutor did not constitute such improper vouching. The first statement, as explained above, was rebuttal to Wade's argument that Nixon was willing to lie for a lighter sentence. The other two statements were made as part of the prosecutor's explanation of how all the evidence presented at trial by law enforcement officers, the medical examiner, and other witnesses corroborated Nixon's testimony. The statements were thus part of a "fair reply" to the defense argument that Nixon was not credible. See id. at 1013 (holding that the prosecutor's suggestion that a witness's testimony was credible was "fair reply" to defense argument that it was not).
Wade next argues that the prosecutor made an impermissible comment on his constitutional right not to testify. In discussing Nixon's testimony, the prosecutor stated the following:
Bruce Nixon was the last one in and the first one out. There is no evidence that Alan Wade said a word to law enforcement about Bruce Nixon. Why is Bruce Nixonnot in March. Why is Bruce Nixon in July right after these crimes telling the police Alan Wade, my best friend, the son of my de facto mother, is committing these crimes with me? All he had to do was give up Tiffany Cole and Michael Jackson.
Wade specifically challenges the statement underlined above. Viewed in isolation, the prosecutor's statement might be construed as referring to Wade's silence. However, in context it is clear that the prosecutor was simply relying on the fact that Wade had not implicated Nixon to demonstrate that Nixon had no reason to lie about his *870 best friend's involvement in the crimes at the time he confessed to police. Nevertheless, even if the comment was erroneous, it does not constitute fundamental error. See Poole v. State, 997 So.2d 382, 391 (Fla.2008); see also Jones v. State, 998 So.2d 573, 589 (Fla.2008) (stating that to require mistrial, an improper comment must deprive the defendant of a fair trial).

2. Alleged Error in Penalty-Phase Arguments
Wade claims that the prosecutor made two improper arguments during the penalty phase. First, he asserts that the prosecutor made an impermissible "golden rule" argument in addressing the applicability of the HAC aggravator. In his argument, the prosecutor first explained the definition of HAC and then recounted the facts of the crime to the jury. During that recitation of the facts, the prosecutor stated the following:
How about being driven down that road, stopping for gas in a trunk not knowing what's going on, wondering where they are at, why have they stopped, are they going to be set free, what is in store for them?
Was their horror over? No. It had just begun. A 35-mile drive going to where they could not know, probably 45 minutes in the trunk of their car, perhaps more. They get to somewhere else. They stop. They don't know where they're at. There are no lights. There are no friends. There's no family.
The prosecutor then continued with the description of the victims being buried alive and stated that the facts of the crime were consonant with a finding of HAC.
We find no error in the prosecutor's argument. A prohibited "golden rule" argument invites jurors to put themselves in the victim's position and then imagine the victim's final pain, terror, and defenselessness. Bailey v. State, 998 So.2d 545, 555 (Fla.2008), cert. denied, ___ U.S. ___, 129 S.Ct. 2395, 173 L.Ed.2d 1307 (2009). Here, the State's recitation of the facts of the case was accurate and did not invite the jury to put themselves in the victims' place. The HAC aggravator "applies in physically and mentally torturous murders" and "focuses on the means and manner in which the death is inflicted and the immediate circumstances surrounding the death, rather than the intent and motivation of a defendant, where a victim experiences the torturous anxiety and fear of impending death." Barnhill v. State, 834 So.2d 836, 849-50 (Fla.2002). Thus, the prosecutor merely explained the evidence consistent with the application of the HAC aggravator.
Second, Wade argues that the prosecutor improperly instructed the jurors by telling them that a vote for life would be both irresponsible and a violation of their lawful duty. During closing argument, the prosecutor stated the following:
You might hear an argument about life is enough. Life is however many years he's got left and leaves that prison only when he dies. What I suggest to you is that argument tells you that this defendant should not be held fully accountable for his actions. The argument in essence says let's take the easy way out. I know life is life and I know it will be a miserable life in prison and let's give him life, but that's not the law of the State of Florida. You have to weigh and weigh this aggravation and you will find that it cries out for full accountability.
Ask you[rselves] what facts that you heard in mitigation rises to the level to legally mitigate against the actions of July, 2005? Did you hear anything to outweigh, to contradict the aggravating factors? Are we saying that he was deprived, therefore, he was depraved? *871 It's not the environment but it's how you choose to deal with the environment.
Wade claims that the underlined language above is nearly identical to arguments we previously deemed impermissible in cases such as Urbin v. State, 714 So.2d 411, 421 (Fla.1998).
We disagree. Although the prosecutors in Urbin and in this case both urged the jury not to "take the easy way out" and vote for life, there is an important difference between the two cases. In Urbin the prosecutor told the jury that it was their duty to return a recommendation of deaththat the law required them to make that recommendation. Id.; see also Rodriguez v. State, 919 So.2d 1252, 1282 (Fla.2005) (stating in a postconviction case that prosecutor's statement admonishing the jury not to do the "easy thing" and vote for life, which "would not be the legal thing to do," was made "while explaining. . . the purpose of aggravating and mitigating factors" and concluding that "[e]ven assuming the comment was improper it was harmless"). In this case, the prosecutor correctly told the jurors that it was their duty actually to weigh the factors, but he in no way implied that the jury was required by law to return a recommendation of death. Accordingly, the prosecutor's argument does not constitute error, much less fundamental error.
Having reviewed the alleged errors discussed above, we hold that none of the prosecutor's statements either individually or cumulatively constitute fundamental error.

C. Motion for Mistrial Based on an Alleged "Golden Rule" Violation
In the foregoing section, we addressed claims that the prosecutor committed fundamental error in closing arguments. We now turn to Wade's preserved claim that the prosecutor made an impermissible "golden rule" argument.
The prosecutor concluded the guilt phase with a review of the case as follows:
At the beginning of this case in jury selection we talked about the presumption of innocence, the cloak of innocence. His [Wade's] cloak of innocence has been dirtied with the dirt of the Sumners' grave.
This case as I told you in opening is about love and greed, the love of Carol and Reggie's family and neighbors that was passed on to law enforcement who worked so hard to put a chain together, a chain that began when Rhonda [Carol Sumner's daughter] spoke to the Sheriff's Office, a chain that continued through fingerprints, through checks, through direct evidence, through timelines, a chain that had a link of a key, the key to the crime who left his mark on that mail.[[4]]
Ladies and gentlemen, it was greed that brought you here today. When you are done I ask you to walk out not into the darkness of greed, into the terror of the night drive in the back of a trunk but into the light of justice. In the last link in this chain the justice will be when you find that man not just guilty but fully accountable for every action that he committed when he abducted, robbed and buried Reggie and Carol alive. Thank you.
Wade immediately moved for mistrial, arguing that the underlined language above constituted a "golden rule" violation. The *872 trial court denied the motion, and Wade did not request a curative instruction.
"A motion for mistrial should be granted only when the error is deemed so prejudicial that it vitiates the entire trial, depriving the defendant of a fair proceeding." Floyd v. State, 913 So.2d 564, 576 (Fla.2005). We review the trial court's ruling on a mistrial motion for abuse of discretion. Id.
As we explained previously, an impermissible "golden rule" argument invites jurors to put themselves in the victim's position and then imagine the victim's suffering. See Bailey, 998 So.2d at 555; Merck v. State, 975 So.2d 1054, 1062 (Fla. 2007). We conclude that the prosecutor's argument here does not violate the prohibition on such arguments. Accordingly, we hold that the comment does not constitute reversible error and the trial court did not abuse its discretion in denying the motion for mistrial.
In holding that the argument did not constitute a "golden rule" argument, we do not suggest that this argument was proper. We recognize that the prosecutor's statement might be subject to challenge as an improper "blatant appeal to jurors' emotions," Ruiz v. State, 743 So.2d 1, 7 (Fla.1999), in that it suggested that an acquittal would constitute walking "into the darkness of greed" rather than "into the light of justice."

D. Motion to Preclude the Death Penalty
After the jury in this case recommended sentences of death in both murders by a vote of eleven to one, Wade filed a motion to preclude the imposition of the death sentences. In his motion and accompanying memorandum, he argued that Florida's death penalty scheme is unconstitutional because it fails to preclude problems of arbitrariness in capital sentencing and thus does not comply with Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972). The defendant's argument was based on the Capital Jury Project (CJP) study, a research initiative that attempted to analyze jurors' understanding of their role and the exercise of their discretion in capital sentencing cases through post-sentencing juror interviews. See Capital Jury Project, http://albany.edu/ scj/CJPhome.htm. Wade argued that the fourteen-state study demonstrated, for example, that a large percentage of jurors make premature determinations regarding sentencing during the guilt phase and believe that they are required to recommend death under certain circumstances. The trial court orally denied an evidentiary hearing at which Wade proposed to present testimony regarding the CJP study and denied the motion to preclude imposition of a death sentence.
On appeal, Wade uses the CJP study to challenge the constitutionality of the jury selection process in his case. Comparing the results of the CJP study with answers to voir dire questioning in his own case, Wade concludes that the jury selection process resulted in the seating of a panel of "pro death-biased jurors" after the State was permitted to use peremptory and cause challenges to strike jurors who showed a lack of support for the death penalty. Further, Wade claims he was wrongly forced to use two peremptory challenges to strike jurors who strongly supported the death penalty. Finally, Wade argues that the trial court erred in denying his motion to preclude imposition of a death sentence without hearing legal testimony that Florida's use of the same jury in the guilt and penalty phases of trial violates Furman. As explained below, we hold that Wade is entitled to no relief.
First, we have previously rejected the contention that potential jurors should not be subject to removal for cause or by *873 peremptory challenge for expressing hesitancy concerning the recommendation of a death sentence. In San Martin v. State, 705 So.2d 1337, 1343 (Fla.1997), we explained as follows:
[W]e find no merit to this claim as "the Constitution does not prohibit the States from `death qualifying' juries in capital cases." Lockhart v. McCree, 476 U.S. 162, 173, 106 S.Ct. 1758, 1764, 90 L.Ed.2d 137 (1986). Indeed, any group "defined solely in terms of shared attitudes that render members of the group unable to serve as jurors in a particular case [ ] may be excluded from jury service without contravening any of the basic objectives of the fair-cross-section requirement." Id. at 176-77, 106 S.Ct. at 1766-67. As the Supreme Court further noted in Lockhart, not all individuals who oppose the death penalty are subject to removal for cause in capital cases; "only those who cannot and will not conscientiously obey the law with respect to one of the issues in a capital case." Id. at 176, 106 S.Ct. at 1766. Moreover, the State may properly exercise its peremptory challenges to strike prospective jurors who are opposed to the death penalty, but not subject to challenge for cause. Under Florida law, a party's use of peremptory challenges is limited only by the rule that the challenges may not be used to exclude members of a "distinctive group." See State v. Neil, 457 So.2d 481 (Fla.1984) (holding that race-based peremptory challenges violate the defendant's right to an impartial jury); State v. Alen, 616 So.2d 452 (Fla.1993) (same as to ethnicity); Abshire v. State, 642 So.2d 542 (Fla. 1994) (same as to gender). Both parties have the right to peremptorily strike "persons thought to be inclined against their interests." Holland v. Illinois, 493 U.S. 474, 480, 110 S.Ct. 803, 807, 107 L.Ed.2d 905 (1990). Thus, we find no constitutional infirmity in Florida's jury selection process in general.
See Lockhart v. McCree, 476 U.S. 162, 180, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986) (stating that jurors may be struck for cause when their opposition to the death penalty would preclude them from impartially following the law).
In a related argument, Wade contends that he was wrongly forced to use peremptory challenges to remove two prospective jurors (Ms. Cue and Mr. Meyers) who expressed strong support for the death penalty. This claim, however, is not preserved for review. In order to demonstrate that the use of a peremptory challenge to cure the erroneous denial of a challenge for cause was reversible error, a defendant must exhaust all remaining peremptory challenges and show that an objectionable juror served as a juror. Busby v. State, 894 So.2d 88, 96-97 (Fla. 2004). That is, Wade must prove prejudice by showing that a person actually sat on the jury whom Wade challenged for cause, attempted to strike peremptorily, or otherwise challenged after his peremptory challenges had been exhausted. Id. at 97 (citing Trotter v. State, 576 So.2d 691, 693 (Fla.1990)). First, Wade never sought Ms. Cue's dismissal for cause, and Wade's cause challenge to Mr. Meyers was based on Meyers' availability. Thus, Wade did not seek to disqualify either juror based on voir dire statements regarding the death penalty. Second, although defense counsel struck these two prospective jurors with peremptories and timely requested additional peremptories after exhausting his allotted challenges, counsel failed to identify any juror he would have stricken if the court had granted his request. Accordingly, Wade has neither preserved nor demonstrated reversible error.
*874 Further, Wade states that the CJP study shows that many jurors prematurely make a sentencing decision during the guilt phase of trial. As a result, he argues that the Federal Constitution requires that Florida use two separate juries in death penalty casesone to adjudicate guilt and one to recommend a sentence. Although Wade argued in his trial court motion that jurors' premature determination that death is the appropriate penalty is unconstitutional, he did not argueas he does in this appealthat this alleged Furman violation can be remedied through the use of separate guilt- and penalty-phase juries. Further, although on appeal he requests that a new penalty phase be held, he did not request such relief below. Accordingly, this claim is not preserved for review. See Doorbal v. State, 983 So.2d 464, 492 (Fla.2008) ("For an issue to be preserved for appeal, it must be presented to the lower court, and the specific legal argument or ground to be argued on appeal must be part of that presentation.").
On its merits, the argument collides with United States Supreme Court precedent. Florida adopted a single-jury bifurcated trial scheme in 1972. See ch. 72-72, § 1, Laws of Fla. Since then, in Gregg v. Georgia, 428 U.S. 153, 195, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976), the United States Supreme Court has approved bifurcated guilt and penalty proceedings before a single jury in death penalty cases. In Gregg, the Court stated that the concerns it expressed in Furman "are best met by a system that provides for a bifurcated proceeding at which the sentencing authority is apprised of the information relevant to the imposition of sentence and provided with standards to guide its use of the information." Gregg, 428 U.S. at 195, 96 S.Ct. 2909 (plurality opinion). Subsequently, the Supreme Court concluded that the States' interests in using a unitary jury were sufficient to serve as a proper, neutral justification for excluding jurors from the guilt phase who could not impartially serve during the penalty phase. Lockhart, 476 U.S. at 182, 106 S.Ct. 1758. Moreover, the Court found that the use of two different juries would be highly inefficient:
Finally, it seems obvious to us that in most, if not all, capital cases much of the evidence adduced at the guilt phase of the trial will also have a bearing on the penalty phase; if two different juries were to be required, such testimony would have to be presented twice, once to each jury. As the Arkansas Supreme Court has noted, "[s]uch repetitive trials could not be consistently fair to the State and perhaps not even to the accused."
Id. at 181, 106 S.Ct. 1758 (quoting Rector v. State, 280 Ark. 385, 659 S.W.2d 168, 173 (1983)).

E. Motion to Strike Notice of Death Penalty
Wade next argues that the trial court erred in summarily denying his motion to strike the State's notice of intent to seek the death penalty and to preclude imposition of the death penalty in his case. Wade contends, as he did below, that because no statewide uniform protocol governs the decision of a state attorney to seek the death penalty in a first-degree murder case, Florida's capital sentencing scheme is unconstitutional under Furman. This argument is meritless.
In State v. Bloom, 497 So.2d 2 (Fla. 1986), we addressed a question regarding the scope of prosecutorial discretion in seeking the death penalty when a circuit court made a pretrial determination that the State lacked sufficient evidence to seek the death penalty in a first-degree murder *875 case. The State sought a writ of prohibition, arguing that the trial court exceeded its authority. We agreed and held that under article II, section 3 of Florida's constitution, "the decision to charge and prosecute is an executive responsibility, and the state attorney has complete discretion in deciding whether and how to prosecute." Bloom, 497 So.2d at 3 (emphasis added). We have emphasized that "the judiciary has authority to curb pretrial prosecutorial discretion `only in those instances where impermissible motives may be attributed to the prosecution, such as bad faith, race, religion, or a desire to prevent the exercise of the defendant's constitutional rights.'" State v. Donner, 500 So.2d 532, 533 (Fla. 1987) (quoting Bloom, 497 So.2d at 3); see also Wayte v. United States, 470 U.S. 598, 608, 105 S.Ct. 1524, 84 L.Ed.2d 547 (1985) (explaining that to state a claim of selective prosecution for a crime, a petitioner must show that the enforcement system had a discriminatory effect and that it was motivated by a discriminatory purpose).
Further, the Supreme Court has long recognized that such wide prosecutorial discretion in determining whether to pursue the death penalty in a specific case does not run afoul of Furman. In Gregg, the petitioner argued that Georgia's death penalty scheme was unconstitutional because of the "opportunities for discretionary action" inherent in the process, which included the prosecutor's "unfettered authority to select those persons whom he wishes to prosecute for a capital offense and to plea bargain with them." 428 U.S. at 199, 96 S.Ct. 2909. The Supreme Court explained that such discretionary aspects of capital sentencing were not inconsistent with Furman:
The existence of these discretionary stages is not determinative of the issues before us. At each of these stages an actor in the criminal justice system makes a decision which may remove a defendant from consideration as a candidate for the death penalty. Furman, in contrast, dealt with the decision to impose the death sentence on a specific individual who had been convicted of a capital offense. Nothing in any of our cases suggests that the decision to afford an individual defendant mercy violates the Constitution. Furman held only that, in order to minimize the risk that the death penalty would be imposed on a capriciously selected group of offenders, the decision to impose it had to be guided by standards so that the sentencing authority would focus on the particularized circumstances of the crime and the defendant.
Gregg, 428 U.S. at 199, 96 S.Ct. 2909 (emphasis added). Relying on Gregg, the court in Proffitt v. Florida, 428 U.S. 242, 254, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976), rejected a petitioner's contention that Florida's death penalty scheme was unconstitutional in part because the prosecutor has wide discretion to decide whether to charge a capital offense and whether to accept or reject a plea to a lesser offense. In McCleskey v. Kemp, 481 U.S. 279, 296, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987), the Supreme Court rejected a claim of racial bias in the imposition of death sentences and again emphasized that "discretion is essential to the criminal justice process" and insisted it would "demand exceptionally clear proof" before finding an abuse of that discretion. Id. at 297, 107 S.Ct. 1756.
Wade's reliance on Freeman v. Attorney General, 536 F.3d 1225, 1232 (11th Cir. 2008), cert. denied, ___ U.S. ___, 129 S.Ct. 921, 173 L.Ed.2d 129 (2009), to support his contention is misplaced. The defendant in Freeman did not challenge the state attorney's protocol for determining whether to pursue a death sentence. What Freeman argued was that the prosecutor sought a death sentence in his case *876 because of the defendant's racean impermissible motive. In this case, Wade admits that he neither argues for nor offers evidence of the presence of impermissible motives in the prosecutor's decision to pursue the death penalty in this case.
Accordingly, we reject Wade's argument on this point.

F. Dismissing a Juror for Cause
Wade argues that the trial court committed reversible error in excusing a juror for cause because of her views regarding the death penalty. We have previously explained that
[a] potential juror may be excused "for cause" if the juror has a state of mind regarding the case "that will prevent the juror from acting with impartiality." § 913.03(10), Fla. Stat. (2006). In a capital case, this standard is met if a juror's views on the death penalty "prevent or substantially impair the performance of his or her duties as a juror in accordance with the juror's instructions or oath." Fernandez [v. State], 730 So.2d [277, 281 (Fla.1999)]. "A juror must be excused for cause if any reasonable doubt exists as to whether the juror possesses an impartial state of mind." Ault v. State, 866 So.2d 674, 683 (Fla. 2003).
Johnson v. State, 969 So.2d 938, 946 (Fla. 2007), cert. denied, 553 U.S. 1007, 128 S.Ct. 2056, 170 L.Ed.2d 799 (2008). Thus, in review of claims that the trial court erred in dismissing a juror for cause, we consider all of the juror's voir dire responses regarding the death penalty, Johnson, 969 So.2d at 946, and defer to the trial judge's determination of a juror's qualifications "because trial courts have a unique vantage point in their observation of jurors' voir dire responses." Conde v. State, 860 So.2d 930, 939 (Fla.2003). In light of the trial court's great discretion in determining juror competency, we will not overturn the trial court's decision on a cause challenge absent manifest error.
During voir dire in this case, the prosecutor asked the jurors about their views on the death penalty. Ms. Butler responded that her views were "mixed." Asked if her death penalty views would impair her ability to make a decision regarding the defendant's guilt or innocence, she responded: "No. You're going to have to really show me the facts. I have to live with it." Asked if she meant that because the death penalty was involved she would require extra facts from the State, she answered: "I've got to really know. I got to really feel that or know for sure that." The prosecutor then turned to the penalty phase, and the following exchanges occurred:
[PROSECUTOR]: And then you're going to be asked does thedo the aggravating factors outweigh the mitigating factors, and if you believe they do beyond a reasonable doubt my question is: Can you vote for the death penalty or is your personal feelings going to be weighing on you and cause you some concern?
[MS. BUTLER]: (Nods head affirmatively.)
[PROSECUTOR]: Yes?
[MS. BUTLER]: Yeah.
[PROSECUTOR]: Yes, you can or yes it's going to be weighing on you and cause you some concerns?
[MS. BUTLER]: Well, if I gotif the facts is there then, yes, I can go for the death penalty depending on it.
[PROSECUTOR]: Let me ask you a question I'm going to ask everyone else later. The burden of proof the state has to prove is proving a defendant guilty beyond a reasonable doubt. The Court will define that for you.

*877 That burden of proof is the same in any criminal case whether it's a shoplifting case, a burglary case or a death penalty case.
Would you hold the state to a higher burden of proof because the death penalty is a possible penalty?
[MS. BUTLER]: Possibly, yeah.
[PROSECUTOR]: Possibly?
[MS. BUTLER]: Yeah.
Subsequently, defense counsel questioned Ms. Butler as follows:
[COUNSEL]: Okay. And, Ms. Butler, in this particular case, ma'am, do I take it then that you'd just rather not sit you don't feel that you could be a fair juror in this case just because
[MS. BUTLER]: No.
[COUNSEL]: I'm sorry, ma'am?
[MS. BUTLER]: I just don't feel comfortable in this case.
Defense counsel then asked the panel members to select a number from one to five to describe their attitude toward the death penalty, with one representing "somewhat in favor" and five indicating "strongly in favor." In defense counsel's questioning of Ms. Butler, the following exchange occurred:
[COUNSEL]: I had down here something about the burden of proof. Mr. Plotkin [prosecutor] asked you and I think you indicated you could sit in a guilt phase of a trial, right? Find someone guilty or not guilty, you could do that, right?
[MS. BUTLER]: I could do that, yes.
[COUNSEL]: I think his questions dealt with would you require the state to have a higher burden of proof in a death case. I think that's where we had talkedhe talked to you a little bit about that. You remember that?
[MS. BUTLER]: Yes.
[COUNSEL]: Now let me ask you this: The law isburden of proof is beyond and to the exclusion of a reasonable doubt in death cases and non-death cases. In a DUI case and in aI don't know, a robbery case sameit's the same burden of proof, okay?
Now knowing that the state has the burden of proof, okaywe don't have a burden, but they have a burden of proof not only in the guilt phase but also in the penalty phase. They have to prove these aggravators beyond and to the exclusion of every reasonable doubt. Okay. That's the standard burden in every case. You wouldn't require them to have a higher burden than that, would you?
[MS. BUTLER]: If they've got proofif theyif they have sole proof that whatever it was that occurred then, yes, I couldI could see myself voting for the death penalty.
[COUNSEL]: Okay. So ifif in the in the penalty phase
[MS. BUTLER]: In the penalty phase.
[COUNSEL]:if they presented aggravation, factors that beyond a reasonable doubt outweighed the mitigators, then you could apply the law and follow the law and vote death, is that right?
[MS. BUTLER]: Yeah.
[COUNSEL]: Okay. All right. Now that I said that on my scale, one to five, where would you be?
[MS. BUTLER]: I'm still a two.
At the conclusion of voir dire and out of the presence of the prospective jurors, the trial judge sua sponte dismissed Ms. Butler and another person for cause.[5] The judge explained that he did not see how *878 Ms. Butler could qualify to serve based on her views regarding the death penalty and noted that she "waffled on two or three things." The court rejected defense counsel's objection and contention that he had rehabilitated her. At the conclusion of jury selection, defense counsel entered a standing objection to Ms. Butler's dismissal.
As evidenced by the foregoing transcript excerpts, Ms. Butler consistently expressed her discomfort in a death penalty case and made several statements suggesting that she would require the State to meet a higher standard, including requiring that the State produce "sole proof." We conclude that her equivocal statements regarding her ability to recommend a death sentence provide sufficient basis for the trial court's determination that she was disqualified as a juror. See Johnson, 969 So.2d at 948 ("Persistent equivocation or vacillation by a potential juror on whether he or she can set aside biases or misgivings concerning the death penalty in a capital penalty phase supplies the reasonable doubt as to the juror's impartiality which justifies dismissal."). Accordingly, we hold that the trial court did not abuse its discretion in excusing her for cause.
Wade also argues that the trial court should have excused two other potential jurorsMs. Cue and Mr. Meyersfor cause because of their pro-death-penalty views. First, as we explained previously, this argument is not preserved. Wade did not challenge Ms. Cue for cause, and he challenged Mr. Meyers for cause based on his availability to serve. Second, Wade used peremptories to strike these potential jurors and did not preserve for review his claim that the trial court should have granted him additional peremptory challenges.

G. Applicability of Roper v. Simmons

Citing Roper v. Simmons, 543 U.S. 551, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005), which held that it is unconstitutional to execute defendants who were under the age of eighteen at the time they committed their crimes, Wade argues that his death sentence is unconstitutional. Admitting that he was eighteen when the Sumners were murdered, Wade contends that age cannot be the sole factor used to separate adults from juveniles for purposes of determining death eligibility. He argues that Roper requires consideration of other factorssuch as immaturity and the influence of othersthat demonstrate he was actually a juvenile at the time of the crimes. We have previously rejected such an alteration of Roper's bright-line rule. See Hill v. State, 921 So.2d 579, 584 (Fla. 2006) ("Roper only prohibits the execution of those defendants whose chronological age is below eighteen."). Accordingly, we hold that Wade is entitled to no relief on this claim.

H. Sufficiency of the Evidence and Proportionality
In the direct appeal of a death-sentenced defendant, this Court has a duty to review both the sufficiency of the evidence and the proportionality of the sentence, regardless of whether the appellant raises these issues. See Fla. R.App. P. 9.142(a)(6).

1. Sufficiency of the Evidence
In determining whether sufficient evidence supports the murder convictions, this Court views the evidence in the light most favorable to upholding the verdict. See Smith v. State, 7 So.3d 473, 509 (Fla.2009). We conclude that a rational trier of fact could have found the existence of the elements of first-degree murder (both as premeditated and felony murder) beyond a reasonable doubt. See Simpson *879 v. State, 3 So.3d 1135, 1147 (Fla.), cert. denied, ___ U.S. ___, 130 S.Ct. 91, 175 L.Ed.2d 62 (2009). In summary, the evidence showed that Wadewith Jackson and Coleplanned to commit a robbery, and then Wade invited Nixon to join them in their criminal scheme. Together, the group planned the details of the robbery and murders, and Wade participated in obtaining the materials needed to implement the plan. On July 8, 2005, first Wade and Nixon entered the Sumners' home, and then Wade and Jackson obtained their financial account information. Subsequently, Wade and Nixon put the Sumners in the trunk of their own car and drove them to the gravesite in Georgia. There, Wade and Jackson placed the couple in the hole and buried them alive after obtaining the PINs to the couple's financial accounts. The group later obtained money from the Sumners' bank account, and Wade and Cole returned to the Sumners' home and stole their computer. Within days, authorities arrested Wade with Cole and Jackson in a South Carolina hotel where they found evidence linking all three to the crimes, including a check for $8,000 on the Sumners' account made out to Wade and dated July 8, 2005.

2. Proportionality
We have stated that the death penalty is reserved for the most aggravated and least mitigated of first-degree murders. Lebron v. State, 982 So.2d 649, 668 (Fla.2008). Thus, in conducting a proportionality review, we consider the totality of the circumstances in the capital case and compare the case with other similar capital cases to determine whether the case falls in this category and the death sentence is thus warranted. Our review is qualitative rather than quantitative in nature.
As we explained previously, in imposing two death sentences in this case, the trial court found seven aggravating factors as to each murder, including HAC and CCP, which are two of the weightiest of the aggravators. Further, the court found three statutory mitigators. Although the court ascribed great weight to the age mitigator because Wade was only eighteen at the time of the murders, the court did not ascribe significant weight to the other two statutory mitigators. The court found that both substantial domination and the impaired capacity to conform to the requirements of law mitigators had little evidence to support them. Further, the trial court found many of the twenty nonstatutory mitigating factors were duplicative.
We hold that the death sentences in this case are proportional to other capital cases which involved multiple murders and similar aggravation and mitigation. In Frances v. State, 970 So.2d 806, 810 (Fla.2007), cert. denied 553 U.S. 1039, 128 S.Ct. 2441, 171 L.Ed.2d 241 (2008), for example, the defendant and his brother gained admission to the home of family friends, murdered the two people there, and then stole items from the home and took the family's car. The trial court sentenced Frances to death for both murders, finding two statutory aggravators as to both murders prior capital felony conviction and committed in the course of a robberyand the additional aggravator of HAC as to one of the murders. Id. at 812. In mitigation, the court found the statutory mitigator of Frances's age and other nonstatutory mitigation, to some of which the trial court ascribed serious weight. Id.; see also Hunter v. State, 8 So.3d 1052, 1057 (Fla. 2008) (affirming multiple death sentences where defendant and codefendants invaded home and murdered its occupants with baseball bats, and where the court found five statutory aggravatorsprior violent felony conviction, HAC, CCP, committed in the course of a burglary, and committed to avoid arrestand three statutory mitigators, *880 including defendant's age), cert. denied, ___ U.S. ___, 129 S.Ct. 2005, 173 L.Ed.2d 1101 (2009); Davis v. State, 2 So.3d 952, 965 (Fla.2008) (affirming death sentences where defendant entered home of friends and killed its two occupants, and the court found four aggravating factors HAC, CCP, prior capital felony based on the contemporaneous murder, and committed in the course of a burglaryand three statutory mitigators, including the defendant's age), cert. denied, ___ U.S. ___, 129 S.Ct. 2872, 174 L.Ed.2d 585 (2009).

III. CONCLUSION
Having reviewed Wade's claims and after independently reviewing the sufficiency of the evidence and the proportionality of Wade's death sentences, we affirm the judgment and sentences.
It is so ordered.
QUINCE, C.J., and PARIENTE, LEWIS, CANADY, POLSTON, LABARGA, and PERRY, JJ., concur.
PARIENTE, J., specially concurs with an opinion, in which QUINCE, C.J., LABARGA, and PERRY, JJ., concur.
PARIENTE, J., specially concurring.
I concur in the affirmance of the convictions. I write only to express my concern with two of the prosecutor's closing arguments.
The first argument I consider objectionable is the prosecutor's argument that a recommendation of life imprisonment would be to "take the easy way out." This argument implies that any sentence less than death is impermissible and would be an abdication of the jury's responsibility. While the argument in this case is not as egregious as the one we condemned in Urbin v. State, 714 So.2d 411, 421 (Fla. 1998), the argument is still one prosecutors should avoid.
A jury's recommendation of life is not the "easy way out." To the contrary, as we have now made absolutely clear by our newly adopted Standard Jury Instructions, a jury is never obligated or required to recommend death under the law in this state. See Fla. Std. Jury Instr. (Crim.) 7.11 (Penalty ProceedingsCapital Cases); see also In re Standard Jury Instructions in Criminal CasesReport No. 2005-2, 22 So.3d 17, 22 (Fla.2009) (adopting the "amendment stating that the jury is `neither compelled nor required to recommend death'").
As to the second objectionable argument, the prosecutor made an emotional and inflammatory appeal to the jurors by stating, "When you are done I ask you to walk out not into the darkness of greed, into the terror of the night in the back of the trunk but into the light of justice." Because the victims in this case were both bound and placed into a trunk, this argument impermissibly invited the jury to place themselves in the victims' placein the trunk. Regardless of whether or not the argument is considered an impermissible "golden rule" argument, as the majority points out, it is improper because it is a "blatant appeal to the jurors' emotions."
This type of argument simply should have no place in a prosecutor's closing argumentsespecially in a capital case. Death penalty cases, by the very nature of the crimes involved, have the potential to arouse emotions and passions. As officers of the court, prosecutors must ensure, to the extent possible, a dispassionate and objective jury deliberation process. Prosecutors have an obligation not to inject "elements of emotion and fear into the jury's deliberations." Urbin, 714 So.2d at 419 (quoting King v. State, 623 So.2d 486, 488 (Fla.1993)). As has been repeatedly stated:

*881 Although prosecutors have an awesome responsibility and the facts of the crime often inspire righteous indignation, they are also officers of the court who have duties to both "refrain from improper methods calculated to produce a wrongful conviction" and "to use every legitimate means to bring about a just one."
Salazar v. State, 991 So.2d 364, 383 (Fla. 2008) (quoting Gore v. State, 719 So.2d 1197, 1202 (Fla.1998)), cert. denied, ___ U.S. ___, 129 S.Ct. 1347, 173 L.Ed.2d 614 (2009).
While no reversible error occurred in this case, I once again urge prosecutors to remember to exercise caution in closing argument and to not cross the line from zealous advocacy to impermissible emotional and inflammatory arguments.
QUINCE, C.J., and LABARGA, and PERRY, JJ., concur.
NOTES
[1] Although the indictment charged armed robbery and armed kidnapping, the charges were later amended to delete the "armed" element on these two counts in light of the evidence that a toy gun was used.
[2] See Spencer v. State, 615 So.2d 688, 690-91 (Fla. 1993) (requiring a hearing for the presentation of additional evidence to be held after the jury makes a sentence recommendation).
[3] The trial court sentenced Wade to sentences of life on the two kidnapping convictions and to fifteen years on the two robbery convictions, with all sentences to run concurrently with the death sentences.
[4] Here, the prosecutor refers to the discovery of Wade's fingerprint on the Sumners' mail recovered from the Mazda.
[5] The prosecutor then also moved for the two jurors' dismissal "for the record."