# Supreme Court of Florida

_____

No. SC13-1003
_____

**ALAN LYNDELL WADE,**
Appellant,

vs.

**STATE OF FLORIDA,**
Appellee.

[December 11, 2014]

PER CURIAM.

Alan Lyndell Wade appeals an order of the circuit court denying his motion to vacate his convictions and sentences—including two convictions for first-degree murder and two sentences of death—filed under Florida Rule of Criminal Procedure 3.851. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. For the reasons expressed below, we affirm the postconviction court's order.

## I. BACKGROUND

Wade was convicted of two counts of first-degree murder, two counts of kidnapping, and two counts of robbery in connection with the murders of Carol and Reggie Sumner in July 2005. Wade v. State, 41 So. 3d 857, 862 (Fla. 2010).

Wade and his codefendants, Michael Jackson and Tiffany Cole, were tried separately for the crimes. Bruce Nixon was also involved in the crimes but pleaded guilty to two counts of second-degree murder and received concurrent sentences of forty-five years in prison.

In the opinion addressing Wade's direct appeal, this Court set out the facts of the crimes:

> At Wade's trial, the evidence established the following. At the time of the murders, Wade had known codefendant Jackson for at least a year. In the summer of 2005, Wade had visited and partied with Jackson and his girlfriend Cole in South Carolina. In June, Wade arrived at his longtime friend Nixon's home in Jacksonville, driving a Mazda RX-8 that Cole had rented in South Carolina. Wade told Nixon of a vague plan to rob someone but offered no specifics. The next time Wade contacted Nixon was two evenings before the July 8 murders. Wade called and asked whether Nixon would like to join him, Jackson, and Cole in digging a hole. Nixon agreed and purloined four shovels from his neighborhood before his three codefendants appeared at his home in the Mazda.
>
> The foursome drove around before deciding on a good location for the hole—a remote, wooded area located just across the state line in Georgia. Leaving the car parked on the road, the foursome hiked into the woods, where the three men dug a large, deep hole, while Cole held a flashlight. When the group returned to the car, Wade asked Jackson whether Nixon could join their robbery plan, and Jackson agreed. The group then went to Wade's house but left when Wade's mother ordered Jackson out of her home. She considered Jackson a bad influence on her son.
>
> Over the next two days, the four codefendants moved forward with the plan to rob and kill the Sumners. Cole drove Nixon, Jackson, and Wade by the Sumners' Jacksonville home and called the Sumners on her cell phone. Cole knew the victims from when she and they had lived in South Carolina, and Jackson knew them through Cole. Both Reggie and Carol Sumner were sixty-one and in extremely poor health. The Sumners were chosen as victims because of their

vulnerability and the belief that they had considerable financial resources. The four codefendants planned to gain entry to the Sumners' house while the couple was at home and obtain information regarding their financial accounts and the means to access those accounts. Jackson said that he would kill the victims with a lethal injection of medication. He promised his codefendants that they would share the money obtained from the Sumners' accounts and that each would get about $50,000.

The codefendants made preparations to effect their plan. Shortly after midnight on July 7, 2005, Jackson, Cole, and Wade went to Wal-Mart and purchased disposable rubber gloves. Then, at about 8:30 on the evening of the murders, all four codefendants went to an Office Depot, where Cole purchased duct tape and a large roll of plastic wrap. Finally, they obtained a toy gun that shot plastic pellets.

At approximately 10 p.m. on July 8, 2005, Cole drove her three codefendants in the Mazda to the Sumners' home. She and Jackson remained in the car after dropping Wade and Nixon near the home. Wade had the duct tape in his waistband, and Nixon had the toy gun. As Wade and Nixon approached the victims' house, the pair donned plastic gloves. When Carol Sumner opened the door, they asked to use her phone, and she invited them in. Upon entering, Wade quickly pulled out the phone line, while Nixon pointed the toy gun at the couple. Wade grabbed Mr. Sumner around the neck and pushed him down into a chair. They told the couple that they wanted bank and credit cards. Mrs. Sumner began to cry and pleaded with Wade and Nixon not to hurt her and her husband. Nixon took the Sumners into the spare bedroom, where he used duct tape to secure their legs and hands and to cover their mouths and eyes. Jackson then entered the home after being signaled that the victims were secured, and he and Wade began searching for financial information. A pile of mail and financial statements and Reggie Sumner's coin collection were taken to the Mazda.

At Jackson's direction, Wade and Nixon walked the Sumners out to their own Lincoln Town Car and put the couple in its trunk. According to plan, the two cars headed for the predug grave, making only one stop to put gas in the Lincoln. After arriving near the gravesite, Jackson opened the Lincoln's trunk and began screaming when he saw that the victims had worked their way out of the duct tape. The couple lay with their eyes uncovered and hugging each other in the trunk. Jackson ordered Nixon to bind them again. Then,

when Wade was unable to back the Lincoln up to the edge of the grave, Nixon did so. Jackson then sent Nixon to wait with Cole at the road, where she had remained with the Mazda.

Later, Wade and Jackson drove the Lincoln up to the road where Cole and Nixon waited. Jackson held a yellow legal pad and reported that it contained the previously unknown personal identification numbers (PINs) for the Sumners' bank cards. Then, with Wade and Nixon in the Lincoln and Jackson and Cole in the Mazda, the foursome drove to Sanderson, Florida, where they abandoned the Lincoln after wiping it clean of prints. They left the four shovels in its trunk.

All four codefendants then returned to Jacksonville in the Mazda. They went to an automated teller machine (ATM), where Jackson withdrew money from one of the Sumners' accounts, and then the group went to their hotel. Subsequently, Wade and Cole went to Wal-Mart, where they purchased gloves and bleach. They also returned to the Sumners' home and stole the computer. Nixon stayed with his codefendants another day and then went home. Wade, however, stayed with Cole and Jackson and traveled with them to Charleston, South Carolina. There, Cole rented two hotel rooms—one for her and Jackson and the other for Wade.

Carol Sumner['s] daughter reported her inability to contact the couple to the Jacksonville Sheriff's Office on July 10, and the next day the couple was reported missing and a "BOLO" issued for the couple's car. On July 12 the car was found, and the law enforcement investigation of the Sumners' financial accounts revealed an unusual number of recent ATM withdrawals. Video from the ATMs revealed Michael Jackson's face and a silver Mazda in the background. Wade called Nixon to inform him that the Lincoln had been found and told Nixon to "be cool." About this same time, Nixon went to a keg party. There, while intoxicated, Nixon told a friend that he had buried someone alive and showed his wallet containing about $200 in $20 bills.

Posing as Reggie Sumner, Jackson contacted Jacksonville law enforcement officers by phone on July 12, and he assured the homicide detective that he and his "wife" were fine. Cole, posing as Carol Sumner, made the same assurances. Jackson also reported that he was having trouble accessing the Sumners' accounts and requested the detective's help. On July 14, Jackson, Cole, and Wade were located and arrested at their South Carolina hotel, and their rooms

were searched pursuant to warrants. Carol Sumner's key ring containing the keys to the Lincoln was found on the nightstand in Wade's room. In the room with Jackson and Cole, law enforcement officers found a suitcase full of the Sumners' financial records, bags of recent purchases made on the Sumners' accounts, receipts for those purchases and for purchases made earlier in Jacksonville, and other items, including the Sumners' driver licenses, credit and bank cards, and checks and check register. Notably, a check for $8,000 on the Sumners' account had been made payable to Alan Wade. Officers also searched Cole's car, a Chevy Lumina, and the Mazda, which had not been returned to the rental agency but had been recovered by law enforcement officers. In the Lumina, the officers found Reggie Sumner's coin collection, and in the Mazda, they found Wade's fingerprints on one of the victims' magazines. They also found an unused roll of plastic wrap with Cole's and Jackson's fingerprints on it.

Nixon was arrested, and he took officers to the Georgia gravesite. A roll of duct tape was found there, and on the morning of July 15, law enforcement officers began excavation of the gravesite. Both victims were found fully clothed and sitting in crouched positions, with at least two feet of dirt over their heads. The medical examiner testified that both Reggie and Carol were alive in the hole before the dirt was shoveled on them. Their nostrils, mouths, throats, esophagi, and tracheae contained fine sprays of dirt, indicating that the dirt was inhaled. Both victims died of a combination of mechanical asphyxiation, as the dirt compressed their chests and abdomens, and smothering, as the dirt piled up around their heads and obstructed their noses and mouths.

Wade, 41 So. 3d at 862-65 (footnote omitted).

After the penalty phase, the jury recommended a sentence of death for each murder by a vote of eleven to one. The trial court conducted a Spencer v. State, 615 So. 2d 688 (Fla. 1993), hearing, and ultimately followed the jury's recommendation, imposing two sentences of death.

- 5 -

The trial court found seven statutory aggravators applicable to each murder: (1) Wade was previously convicted of a capital felony—the contemporaneous murder of the other victim; (2) the murder was committed in the course of a kidnapping; (3) the murder was especially heinous, atrocious, or cruel (HAC); (4) the murder was cold, calculated, and premeditated; (5) the murder was committed for financial gain; (6) the murder was committed to avoid arrest; and (7) the victim was especially vulnerable due to age or disability. Wade, 41 So. 3d at 866. The trial court did not assign a weight to each aggravating factor but concluded that collectively, they far outweighed the mitigating circumstances. Id. at 867.

The trial court found three statutory mitigating factors to be applicable to each murder: (1) the defendant was eighteen at the time of the crimes (great weight); (2) the defendant was under the substantial domination of another person (little weight); and (3) the defendant's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired (some weight). Regarding the substantial domination mitigating factor, the trial court explained that the factor was "not clearly established" because "although Wade followed Jackson's instructions, no direct evidence established that Wade's 'personality was subdued by' Jackson within the meaning of the mitigator," and Wade played an active role in the criminal scheme by soliciting Nixon's assistance. Id. at 866. Regarding the impaired capacity mitigating factor,

the trial court gave the factor only some weight because the trial court concluded that Wade was "not under the influence of drugs" at the time of the murders and "knew exactly what he was doing." Id.

The trial court also found twenty nonstatutory mitigating factors to be applicable to each murder: (1) Wade's parents were divorced, and he grew up without a father (little weight); (2) Wade was raised by an absentee mother (some weight); (3) Wade was raised in a negative family setting (argumentative, little weight); (4) Wade had difficulty in school (some weight); (5) Wade lacked emotional maturity (argumentative, little weight); (6) Wade lacked parental guidance (duplicative, some weight); (7) Wade had a history of substance abuse (little weight); (8) Wade had a difficult childhood (duplicative, little weight); (9) Wade had mental health issues in his youth (little weight); (10) Wade's mother threw him out of the house when he was sixteen years old (little weight); (11) Wade is a model prisoner (some weight); (12) Wade desires to help others (some weight); (13) Wade has changed for the better in prison (argumentative, some weight); (14) Wade is not known as a violent person in jail and had only one disciplinary review (duplicative, some weight); (15) Wade exhibits positive personality traits in prison (duplicative, some weight); (16) Wade now has the affection and support of his family (little weight); (17) Wade was well-behaved at trial (duplicative, some weight); (18) Wade has demonstrated a potential for

rehabilitation (duplicative, some weight); (19) Wade has helped others in prison and could contribute to society if given a life sentence (duplicative, little weight); and (20) Wade would be a model prisoner with a purposeful life (duplicative, little weight). Id. at 866-67.

Wade raised seven issues on direct appeal. He argued that: (1) his death sentences are disproportionate to codefendant Nixon's sentences, and the trial court erred in sentencing Wade to death without considering Nixon's sentence; (2) the prosecutor made statements during closing arguments that constituted fundamental error; (3) the trial court erred in denying Wade's motion for a mistrial; (4) the trial court erred in denying the defense's motion to preclude imposition of the death penalty under Furman v. Georgia, 408 U.S. 238 (1972), and Wade was wrongly forced to use peremptory challenges to remove jurors who strongly supported the death penalty; (5) the trial court erred in denying the defense's motion to preclude the death penalty on the basis that Florida does not have uniform standards for determining whether to seek the death penalty; (6) the trial court erred in dismissing a potential juror for cause; and (7) Wade's death sentences are illegal under Roper v. Simmons, 543 U.S. 551 (2005). This Court concluded that each of Wade's claims was without merit, the evidence was sufficient to support the murder convictions, and the death sentences were proportionate. Wade, 41 So. 3d at 880.

In 2011, Wade filed a motion for postconviction relief, raising twelve issues. In claim 1, Wade argued that his trial counsel was ineffective during jury selection by: (A) misstating the law governing the weighing process; (B) failing to preserve for review the argument that two jurors should have been excused for cause; and (C) failing to investigate and challenge jurors who were strongly in favor of the death penalty.

In claim 2, Wade argued that trial counsel was ineffective in the guilt phase because counsel failed to: (A) file a motion to suppress; (B) investigate cell phone records; (C) object to improper comments by the prosecutor; (D) object to the tape recording of Jackson and Cole pretending to be the Sumners; (E) object to the admission of items seized from the hotel room shared by Jackson and Cole; (F) object to the admission of photographs of Jackson using the victims' bank card; (G) object to Frieda Ganey's testimony and the inconsistent statement admitted through Detective Mark Gupton; (H) object to hearsay introduced through several law enforcement officers; (I) object to United States Marshal David Alred's testimony; (J) object to testimony by Janet Jackson; (K) make a proper argument for a judgment of acquittal; (L) argue the issues of venue and jurisdiction; (M) object to the State's method of introducing exhibits; (N) communicate with Wade, adequately discuss the possibility of a plea bargain, and file a motion under Nelson

v. State, 274 So. 2d 256 (Fla. 4th DCA 1973); and (O) hire independent forensic experts.

In claim 3, Wade argued that trial counsel was ineffective in the penalty phase because counsel: (A) failed to obtain Wade's agreement to release a guilt phase juror from service at the penalty phase; (B) failed to properly investigate and present mitigating evidence; and (C) conceded the aggravating factors that the murders were committed for pecuniary gain and that the murders were HAC.

In his remaining postconviction claims, Wade asserted that: (4) the State violated Brady v. Maryland, 373 U.S. 83 (1963); (5) the State deliberately introduced inadmissible evidence; (6) cumulative error deprived Wade of a fair trial; (7) trial counsel was ineffective for not requesting a new penalty phase to preserve the argument that separate juries should serve at the guilt and penalty phases; (8) trial counsel was ineffective for not presenting evidence of Nixon's sentence; (9) trial counsel was ineffective for not renewing the objections based on Ring v. Arizona, 536 U.S. 584 (2002); (10) trial counsel was ineffective for not preserving the argument that the trial court erred by sentencing Wade without consideration of Nixon's sentence; (11) trial counsel was ineffective for not adequately investigating Wade's complaints and requesting a Nelson hearing; and (12) Wade might be incompetent at the time of execution.

In September 2012, the postconviction court conducted an evidentiary hearing on claims two and three of Wade's motions. In April 2013, the postconviction court entered an order denying Wade's rule 3.851 motion. See State v. Wade, No. 16-2005-CF-10263-BXXX-MA (Fla. 4th Cir. Ct. Apr. 22, 2013) (Postconviction Order). Wade now appeals the postconviction court's order.

Wade contends that the postconviction court erred in denying his claims that trial counsel was ineffective: (1) during the guilt phase for failing to file a motion to suppress, object to the tape recording of Jackson and Cole, object to the evidence seized from the room occupied by Jackson and Cole, object to the photographs of Jackson using the victims' bank card, object to testimony by Ganey and the admission of her prior inconsistent statement, and object to the hearsay and opinion testimony introduced through several law enforcement officers; (2) during the penalty phase for failing to investigate and present mitigating evidence and for conceding the aggravating factors of committed for pecuniary gain and HAC; and (3) during jury selection for misstating the law, failing to preserve for review two denied for-cause challenges, and failing to investigate and challenge jurors who were strongly in favor of the death penalty.

## II. ANALYSIS

### A. INEFFECTIVE ASSISTANCE DURING GUILT PHASE

In order to prevail on a claim of ineffective assistance of counsel, a defendant must show both that trial counsel's performance was deficient and that the deficient performance prejudiced the defendant so as to deprive him of a fair trial. Strickland v. Washington, 466 U.S. 668, 687 (1984). As to the first prong, the defendant must establish that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Id. For the second prong, the reviewing court must determine whether there is a reasonable probability that but for trial counsel's deficiency, "the result of the proceeding would have been different." Id. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id.

This Court employs a mixed standard of review, deferring to the trial court's factual findings that are supported by competent, substantial evidence but reviewing legal conclusions de novo. See Sochor v. State, 883 So. 2d 766, 771-72 (Fla. 2004). Here, the postconviction court did not err in denying Wade's claims of guilt phase ineffective assistance of counsel.

### 1. Motion to Suppress

Wade argues that his trial counsel was ineffective for failing to file a motion to suppress and for failing to object at trial to the admission of evidence recovered from room 302 of the hotel in North Charleston, South Carolina, where he, Jackson, and Cole were arrested. Wade contends that his arrest was illegal and that

because the law enforcement officers failed to disclose relevant information to the judge who issued the search warrant, the warrant was fatally defective. The postconviction court did not err in denying this claim.

Wade's argument that his arrest was illegal is a red herring. The law enforcement officers seized the evidence from room 302 during the search conducted under the search warrant, not during the protective sweep that followed Wade's arrest. Furthermore, no information derived from Wade after his arrest was included in the affidavit used to obtain the search warrant.

Next, the postconviction court correctly concluded that because trial counsel could not have successfully challenged the search warrant, trial counsel did not perform deficiently by not filing a motion to suppress or objecting to the admission of the evidence. See Raleigh v. State, 932 So. 2d 1054, 1064 (Fla. 2006) ("[D]efense counsel cannot be deemed deficient for failing to make a meritless objection.").

"In determining whether probable cause exists to justify a search, the trial court must make a judgment, based on the totality of the circumstances, as to whether from the information contained in the warrant there is a reasonable probability that contraband will be found at a particular place and time." Pagan v. State, 830 So. 2d 792, 806 (Fla. 2002). In this case, the search warrant for rooms 302 and 312 was supported by information establishing a reasonable probability

- 13 -

that contraband would be found in the rooms, and Wade has not established how trial counsel could have demonstrated the warrant to be defective.

On July 14, 2005, Officer James Rowan swore to an affidavit setting out the probable cause for the search. Officer Rowan began with some information about the Sumners and the discovery of their car. He then stated:

> Investigators further identified the victim's bankcard from Heritage Trust Federal Credit Union had been used since the couple had been missing. Investigators obtained video of the individual using the victim's card. The video showed a white male subject using the card to access the ATM to obtain money. The suspect was exiting a vehicle, which appeared to be a silver 2005 Mazda RX-8. Tiffany Cole rented a silver RX-8 from Triangle Rental Car in Charleston, S.C. Tiffany Cole failed to return the vehicle per the rental contract. A tracking device in the vehicle was checked by the rental company and revealed the vehicle had been in the vicinity the victim's vehicle was located in. Contact was made with Tiffany Cole's family at her known address in Ladson, S[.]C. Cole's brother took detectives to the location to be searched to locate Cole. Upon locating Cole she was found to be in the company of a white male matching the photographs of the individual using the victim's ATM card to make a cash withdrawal from an ATM in Jacksonville, and Charleston. Based on the information obtained by Det. Rowan, from other law enforcement officers, there is reason to believe that Cole and her accomplices may have caused harm to the victim[s] and have been using the victims['] financial resources without permission, and further that there may be evidence of the aforementioned crimes under the control of Cole and her accomplices within the locations to be searched.

Relying on Franks v. Delaware, 438 U.S. 154 (1978), Wade argues that if the issuing judge had been informed of more of the details known to the law enforcement officers, the judge would not have granted the warrant as to room 302. In Franks, the United States Supreme Court concluded that a defendant could state

- 14 -

a claim that a warrant was fatally defective due to misstatements in the supporting affidavit if the defendant could proffer proof of his allegations that the affiant had acted with "deliberate falsehood or . . . reckless disregard for the truth." Id. at 171. In Johnson v. State, 660 So. 2d 648 (Fla. 1995), this Court determined that the reasoning of Franks applied to a claim that a warrant was defective as a result of the omission of material information. This Court explained that in analyzing such a claim, "the reviewing court must determine whether the omitted material, if added to the affidavit, would have defeated probable cause" and if "the omission resulted from intentional or reckless police conduct that amounts to deception." Id. at 656.

Here, Wade contends that if the issuing judge had been informed that one man was staying alone in room 302 and that he was not the man seen in the automated teller machine (ATM) surveillance video, the judge would have concluded that there was not probable cause to search room 302. Wade ignores, however, that Officer Rowan's affidavit evinces that the law enforcement officers believed that Cole had accomplices, not merely the assistance of the man photographed at the ATM. Further, at trial, Officer Rowan testified that before going to the hotel to arrest Wade, Jackson, and Cole, he was informed by Cole's brother that Cole had returned to South Carolina with "a couple of guys" and that once at the hotel, Officer Rowan determined that Cole had rented two rooms.

Given that when the warrant was requested, Officer Rowan knew that room 302 was rented by Cole and had cause to believe that Cole was traveling with two men, the fact that Wade alone was staying in room 302 would not negate the probable cause that existed to search the room.

## 2. Tape-Recorded Phone Conversation

Wade asserts that his trial counsel should have objected to the admission of a tape recording of a phone call between Jackson and Cole, posing as the Sumners, and Detective David Meacham of the Jacksonville Sheriff's Office. The recording was introduced into evidence through Detective Meacham. During the call, Jackson and Cole stated that they were Reggie and Carol Sumner and that they were in Delaware attending a family member's funeral. They claimed that a friend from the neighborhood called to tell them that their car had been stolen and inquired about how to unfreeze the Sumners' bank accounts. Wade argues that the recording was irrelevant and hearsay.

The postconviction court concluded that the recording was not hearsay and was relevant to establishing the crime and the identity of the perpetrators. Further, the postconviction court concluded that Wade did not demonstrate deficiency because: (1) he did not establish a legal basis for objecting to the recording; and (2) trial counsel made a reasonable, strategic decision to not object to the evidence. The postconviction court did not err.

The State's theory of prosecution was that Wade was guilty of robbery, kidnapping, and first-degree murder as a result of his own actions and as a principal to the actions of Jackson, Cole, and Nixon. A defendant is guilty as a principal if he "aids, abets, counsels, hires, or otherwise procures such offense to be committed, and such offense is committed or is attempted to be committed." § 777.011, Fla. Stat. (2005). Accordingly, so long as the State offered evidence to establish that Wade aided Jackson and Cole—which it did, for example, through Nixon's testimony—evidence of the actions of Jackson and Cole was relevant to the prosecution of Wade. The recording thus was relevant because it was probative of Jackson and Cole being responsible for the Sumners' disappearance and the group's effort to access the Sumners' bank accounts.

Moreover, the recording was not hearsay. The recording was not offered to prove the truth of its content—that the Sumners were alive and well in Delaware—but to establish that Jackson, Cole, and their accomplices were responsible for the murders. See Jackson v. State, 25 So. 3d 518, 530 (Fla. 2009) ("[I]f the statement is offered for some purpose other than its truth, the statement is not hearsay and is generally admissible if relevant to a material issue in the case." (quoting Penalver v. State, 926 So. 2d 1118, 1132 (Fla. 2006))). Accordingly, Wade has not shown that trial counsel had a basis for objecting to the admission of the recording.

In addition, the postconviction court's conclusion that trial counsel made a reasonable, strategic decision to not object to the recording is also supported by the record and this Court's precedent. Trial counsel, therefore, was not ineffective. See Occhicone v. State, 768 So. 2d 1037, 1048 (Fla. 2000) ("[S]trategic decisions do not constitute ineffective assistance of counsel if alternative courses have been considered and rejected and counsel's decision was reasonable under the norms of professional conduct.").

At the evidentiary hearing, attorney Refik Eler, who was primarily responsible for the guilt phase of Wade's trial, testified that given the evidence linking Wade to Jackson and Cole, he felt that the defense had to admit some wrongdoing by Wade in order to maintain credibility with the jury. Eler stated that he thought the best defense was to argue that Wade was "an accessory after the fact to the theft," who helped "get rid of and dispose of the fruits of the crime" and hoped to be given the victims' car and some money in exchange for cooperating with Jackson and Cole. The defense would argue that Jackson and Cole "sucked [Wade] into this" and that Wade did not participate directly in the robberies, kidnappings, or murders.

Because Eler intended to argue that Jackson was the mastermind of the crime and Wade's role was minimal, Eler reasoned that "the more that Michael Jackson's name is mentioned and Tiffany Cole['s] and the less that Alan Wade's

- 18 -

ame is mentioned the better." Eler testified that his strategy was to let the State "present any evidence about Michael Jackson and Tiffany Cole any time so a jury could hear how—how much they were involved and how little Alan Wade was involved." As for the recorded phone conversation in which Jackson and Cole impersonated the Sumners, Eler explained that he thought about objecting but decided not to because he concluded that the evidence was "helpful to the strategy of the defense blaming Michael Jackson and Tiffany Cole."

Attorney Frank Tassone, who primarily handled Wade's penalty phase, testified that a "joint decision" was made to not object to evidence that implicated Jackson and Cole. Tassone explained that

> any information, piece of evidence, photograph, [or] conversation that linked Tiffany Cole and Mr. Jackson together I probably and almost assuredly would not have objected to knowing what I knew then because I wanted the jury to believe as did Mr. Eler that Mr. Jackson, and, secondly, Ms. Cole were the leaders of this and that Alan [Wade] was essentially just a stupid young man who got caught up in it, so that applies to the dealing with the car rental, things like that.

Tassone reiterated that he made a decision to not object to or attempt to suppress "those specific items [or] a piece of evidence or testimony [that] would help heap more guilt onto Mr. Jackson or Ms. Cole and keep it away from Mr. Wade."

A concession of guilt to some of the prosecutor's claims can be a "good trial strategy and within defense counsel's discretion in order to gain credibility and acceptance of the jury." Atwater v. State, 788 So. 2d 223, 230, 231 (Fla. 2001)

- 19 -

(concluding that trial counsel acted reasonably in conceding Atwater's guilt of second-degree murder in an attempt to "maintain credibility with the jury"); see also Jackson v. State, 127 So. 3d 447, 472-73 (Fla. 2013) ("[Counsel's] decision to not object reflects a trial strategy oriented toward admitting certain crimes (i.e., theft) and not others (i.e., murder and kidnapping), and otherwise presenting Jackson in the best light, which included efforts to not appear as unnecessarily obstructionistic. Without other support for this claim, Jackson has not demonstrated that counsel's performance was deficient under Strickland.").

This Court also has concluded that it can be a reasonable strategy for defense counsel to attempt to shift blame to a codefendant, even when doing so concedes the defendant's guilt. See Shere v. State, 742 So. 2d 215, 221 (Fla. 1999) (concluding that trial counsel acted reasonably in admitting a statement in which codefendant admitted firing fatal shot even though evidence was a "double-edged sword"); Meeks v. State, 418 So. 2d 987, 988 (Fla. 1982) ("We also reject the second contention that appellant's trial counsel was deficient by allowing evidence of the codefendant's participation in the crime. It clearly appears that defense counsel attempted to make the codefendant the more dominant participant.").

Based on the foregoing, the postconviction court did not err in concluding that trial counsel was not ineffective for failing to object to the admission of the

recorded phone call.  The evidence was admissible and consistent with trial counsel's reasonable theory of defense.

### 3.  Evidence Seized from Room 312

Wade next argues that trial counsel should have objected to the introduction into evidence of items seized from room 312 of the hotel on the basis that the danger of unfair prejudice from that evidence substantially outweighed its probative value.  See § 90.403, Fla. Stat. (2007) ("Relevant evidence is inadmissible if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of issues, misleading the jury, or needless presentation of cumulative evidence.").  Wade contends that room 312 was occupied by Jackson and Cole, not Wade, and that as a result, the incriminating items found in that room—bank records taken from the Sumners' home and an $8000 check written against the Sumners' account that was made out to Wade—misled the jury about Wade's culpability.

The postconviction court concluded that trial counsel was not ineffective for not objecting.  The postconviction court reasoned that the items seized from room 312 were relevant and that trial counsel made a reasonable, strategic decision not to object.  The postconviction court did not err.

The bank records and the check were not substantially more unfairly prejudicial than probative.  The bank records were probative of the fact that

- 21 -

Jackson, Cole, and their accomplices were the people who robbed, kidnapped, and murdered the Sumners. The fact that someone wrote a check against the Sumners' account to Wade demonstrated an intent to give some of the proceeds of the crimes to Wade. From this intention, the jury could infer that Wade assisted in perpetrating the crimes. Moreover, Wade has not demonstrated that the evidence was unfairly prejudicial. Wade's argument that there was no evidence that he knew about the check may reduce its probative value but does not render it irrelevant or unfairly prejudicial.

In addition, the postconviction court correctly concluded that trial counsel made a reasonable, strategic decision not to object to the evidence seized from room 312 and thus trial counsel's performance cannot be considered deficient. Attorney Eler testified that he concluded that the check "worked well for the strategy of [Wade] getting rid of things after the fact." Eler reasoned that the check could be seen as Wade's payment and that a concession that Wade was being paid for his role as an accessory would help the defense "stay credible with the jury."

### 4. Photographs of Jackson Using Victims' Bank Card

Wade argues that the postconviction court erred in denying his claim that his trial counsel was ineffective for failing to object to the admission of a series of still photographs taken from ATM surveillance cameras. These photographs showed a

young white male, later identified as Jackson, making withdrawals using the victims' bank card. In some of the photographs, a silver car, consistent with the Mazda rented by Cole, is visible in the background. Wade argues that these photographs could have been excluded on the basis that the danger of unfair prejudice substantially outweighed their probative value. See § 90.403, Fla. Stat. (2007). Again, the postconviction court correctly concluded that the photographs were relevant and that trial counsel made a reasonable, strategic decision not to object.

The photographs were probative of the fact that the group somehow— presumably by force or by searching the Sumners' home—acquired the Sumners' personal identification numbers (PINs) and withdrew money from the Sumners' bank account. As to any danger of confusion, the State never argued that Wade was the person in the photographs. To the contrary, the State argued: "Michael Jackson alone is the person accessing that [bank] card. . . . Michael Jackson very well may be the mastermind of this group. . . . He was the one accessing it but what we know, what we know is [Wade] was with them the whole time." Accordingly, Wade has not shown that upon a motion by trial counsel, the photographs would have been excluded under section 90.403.

In addition, trial counsel cannot be deemed deficient because trial counsel made a reasonable, strategic decision not to object to the photographs. Attorney

Eler did not object to the ATM photographs because he concluded that "as long as Michael Jackson's picture is plastered up there in front of the jury and Alan Wade's picture wasn't[,] that was better."

## 5. Frieda Ganey's Testimony

Wade argues that the postconviction court erred in denying his claim that his trial counsel was ineffective for not objecting to the guilt phase testimony of Frieda Ganey, Wade's mother. Wade contends that the State elicited improper character evidence and that in violation of Morton v. State, 689 So. 2d 259 (Fla. 1997), receded from on other grounds in Rodriguez v. State, 753 So. 2d 29 (Fla. 2000), the State called Ganey for the primary purpose of impeaching her. This claim is without merit. Wade has not demonstrated that an objection to Ganey's testimony would have been sustained, and "defense counsel cannot be deemed deficient for failing to make a meritless objection." See Raleigh, 932 So. 2d at 1064.

During direct examination, Ganey testified that Wade and Nixon met when they were around twelve or thirteen years old and were the "best of friends." She explained that Wade and Nixon were close until Wade was around sixteen years old, when Wade's family moved from Macclenny, Florida, to Jacksonville, Florida. The State next asked Ganey about her son's relationship with Jackson. Ganey testified that when Wade first met Jackson, Wade was about sixteen and was getting help for a drug problem. Wade's improvement stopped once he

- 24 -

became friends with Jackson. Ganey considered Jackson to be "very manipulative" and she did not approve of him. Ganey testified that during the time that Wade and Jackson were friends, Wade did not attend high school and did not have a job. Eventually, in an effort to make him find employment, Ganey forced Wade to move out of the family home.

Ganey testified that during the months of May through July 2005, she generally saw Wade about once a week. Ganey was not aware of Wade having any means of supporting himself during that time but knew that he took trips to Myrtle Beach, South Carolina, with Jackson. Ganey further testified that when she did see Wade during the months of June and July 2005, he usually was with Jackson, and that on one occasion, in late June or early July, she saw Nixon with Jackson. Ganey testified that Wade was at her apartment on the night of Wednesday, July 6, 2005, but that she did not see him at her apartment again until the morning of Saturday, July 9, 2005.

The State then asked Ganey if she remembered talking to Detective Mark Gupton of the Jacksonville Sheriff's Office after Wade was arrested. Ganey explained that she remembered having a conversation with the detective, but because she was in shock and hysterical at the time, she could not remember the details of the conversation. Ganey testified that Wade never spoke to her about his

involvement in the crimes and answered, "[n]o," when asked if Wade told her that Jackson was going to pay him $40,000 to help with the crimes.

The State then called Detective Gupton as its next witness. Detective Gupton testified that he returned a phone call to Ganey and that he recorded their conversation. The State played a nine-second portion of that recording, in which Ganey stated: "I will tell you this because [Nixon] and [Wade] both told me this, that [Jackson] promised them each $40,000 to help him."

First, Ganey's testimony about Wade's drug use, truancy, and lack of employment was not improper character evidence. Evidence of an uncharged, prior crime or bad act "is admissible if it casts light on a material fact in issue other than the defendant's bad character or propensity." Williams v. State, 621 So. 2d 413, 414 (Fla. 1993). Similarly, "[e]vidence of a person's character or a trait of character is inadmissible to prove action in conformity with it on a particular occasion." § 90.404(1), Fla. Stat. (2007). Ganey's testimony about Wade's character was not, however, offered to prove that Wade had a propensity to commit crimes. Ganey related details of Wade's life in order to establish his relationship with Jackson and to show that Wade needed money around the time of the crimes. Ganey's testimony about Wade's truancy and drug use was also relevant to establishing that despite having only recently turned eighteen years old, Wade was

- 26 -

not living with his mother on July 8, 2005, the night the group robbed, kidnapped, and murdered the Sumners.

Second, Ganey's testimony was not improper under Morton. In Morton, this Court clarified when a party may impeach its own witness, explaining:

> [I]f a party knowingly calls a witness for the primary purpose of introducing a prior statement which otherwise would be inadmissible, impeachment should ordinarily be excluded. On the other hand, a party may always impeach its witness if the witness gives affirmatively harmful testimony. In a case where a witness gives both favorable and unfavorable testimony, the party calling the witness should usually be permitted to impeach the witness with a prior inconsistent statement.

689 So. 2d at 264. This Court concluded that the witnesses in Morton's case were not called for the primary purpose of impeachment but that the cumulative effect of the State's impeachment of several witnesses may have made it difficult for the jury to separate the substantive evidence from the impeachment evidence. Id.

This Court applied the reasoning from Morton in Dennis v. State, 817 So. 2d 741, 761 (Fla. 2002). In that case, this Court determined that the record refuted the defendant's claim that a witness was called "in bad faith for the sole purpose of impeaching him." Id. This Court could "discern no evidence of bad faith" where the witness "had relevant testimony to give regarding his awareness of Dennis's whereabouts on the night of the crime as well as the fact that [the victim] had left Dennis and moved out of the apartment only a week prior to the murders." Id.

The testimony at issue in Wade's case is similar to that in Dennis. Ganey's testimony was probative of Wade's association with Jackson, Wade's whereabouts on July 8, 2005, Wade's financial situation at the time of the crimes, and Nixon's credibility and connection to Jackson. Ganey's testimony supported the State's case, in that it tended to establish that Wade played an active role in the criminal enterprise by recruiting Nixon. Therefore, while the State likely hoped to introduce the statement about $40,000, the record demonstrates that Ganey was not called primarily for that purpose.

### 6. Hearsay and Opinion Evidence

In this appellate issue, Wade contends that the postconviction court erred in denying his claim that trial counsel was ineffective for failing to object to hearsay and improper opinions included in the testimonies of Detective Meacham of the Jacksonville Sheriff's Office, Officer Rowan of the North Charleston Police Department, and David Alred of the United States Marshal's Office. The postconviction court did not err in denying this claim of ineffective assistance of counsel.

### a. Hearsay

Wade argues that trial counsel was ineffective for not objecting when the State introduced into evidence a receipt from the Comfort Inn in Jacksonville Beach, Florida. The receipt indicated that Cole paid cash for a room at the hotel on

Tuesday, July 12, 2005, and rather than including merely computer-generated content, the receipt contained an out-of-court statement, presumably by Cole, that she, Jackson, and Wade were the registering guests. The receipt was offered to prove the truth of that assertion—that the three codefendants were together on July 12, 2005. As a result, the receipt was hearsay. See Twilegar v. State, 42 So. 3d 177, 199 (Fla. 2010) ("[T]he receipts were admitted for the truth of the matters asserted (the dates of the purchases, the amounts, the locations, and whether the purchases were made in cash) and Deputy Holt was not qualified to, and did not attempt to, attest to the fact that the receipts were records of regularly conducted business activity for the respective businesses.").

But while trial counsel could have objected to the admission of the hotel receipt on hearsay grounds, trial counsel cannot be considered deficient. Trial counsel made a reasonable, strategic decision not to object to the receipt. Trial counsel's defense theory was that Wade was an accessory after the fact who helped Jackson and Cole access the Sumners' accounts, hide evidence, and enjoy the fruits of the criminal acts. Accordingly, a hotel receipt indicating that Wade was with Jackson and Cole on July 12, 2005—several days after the robberies, kidnappings, and murders—was not inconsistent with Wade's defense.

Likewise, it was consistent with the defense's theory to not object to evidence about Cole's brother's statements to law enforcement officers. Officer

Rowan testified that Cole's brother told him that "his sister had just come back from Florida with a couple of guys," named the hotel in which the group was staying, and identified Cole's car in the hotel parking lot. Officer Rowan testified about these out-of-court statements to explain why he went to the Best Western to look for Wade, Jackson, and Cole. Trial counsel could have objected to this testimony on the basis that the "sequence of events leading to an investigation and an arrest [was] not a material issue." Keen v. State, 775 So. 2d 263, 274 (Fla. 2000). But again, such an objection would not have aided Wade's defense. The defense's theory was that Wade was an accessory after the robberies, kidnappings, and murders. As a result, evidence that Wade was traveling with Jackson and Cole after July 8, 2005, was not harmful to the defense.

Next, Wade argues that trial counsel should have objected on the basis of hearsay to Detective Meacham's testimony about fracture-match testing attempted on the duct tape found at the gravesite. Nixon testified that when preparing to commit the crimes, he, Wade, Jackson, and Cole went to an Office Depot. Detective Meacham, in turn, testified that Cole's bank records and receipts showed that she purchased duct tape from Office Depot on July 8, 2005. Detective Meacham further testified that the Florida Department of Law Enforcement (FDLE) performed fracture-match testing on the torn pieces of duct tape found at the gravesite, but the testing revealed "[n]othing definitive."

Detective Meacham's testimony about the results of the fracture-match testing was hearsay. See State v. Belvin, 986 So. 2d 516, 525 (Fla. 2008) (concluding that an affidavit prepared by a non-testifying technician constituted testimonial hearsay for purposes of the Confrontation Clause). But even if trial counsel could have successfully objected to Detective Meacham's testimony, Wade has not demonstrated that he was prejudiced. Detective Meacham did not explain with what tape the FDLE technician attempted to match the gravesite tape, and he stated that the results of the testing were inconclusive. As a result, Detective Meacham's testimony about the test results was essentially meaningless. It neither implicated nor exculpated Wade.

### b. Opinion Testimony

Wade argues that trial counsel should have objected when Detective Meacham identified Wade as one of the individuals pictured in still photographs and surveillance video from a Wal-Mart and in a surveillance video from a Georgia gas station. Wade contends that if Detective Meacham had not been permitted to identify Wade, the defense could have argued that the man seen at the Wal-Mart and the gas station was Nixon or some other individual.

As the postconviction court concluded, the majority of the evidence challenged by Wade was consistent with the defense's strategy of arguing that Wade was an accessory after the robberies, kidnappings, and murders, not a

- 31 -

participant in those crimes. Trial counsel made a reasonable, strategic decision to not object to evidence that Wade was at a Wal-Mart with Jackson and Cole on July 9, 2005, or with them at a gas station in Georgia on July 12, 2005.

Regarding Detective Meacham's identification of Wade in the still photographs from the July 7, 2005, Wal-Mart surveillance video, even if an objection to the identification would have been sustained, see, e.g., Proctor v. State, 97 So. 3d 313, 315 (Fla. 5th DCA 2012) ("The jurors should have been allowed to determine for themselves whether Proctor was the person shown in the surveillance video."), Wade has not shown that he was prejudiced under Strickland. Wade has not argued any basis upon which trial counsel could have prevented the admission of video or still photographs from that video. Thus, regardless of any defense objection to Detective Meacham's identification testimony, the jury would have seen evidence that a man—consistent in appearance with Wade—entered a Wal-Mart on July 7, 2005, just four minutes after Jackson and Cole entered the store. Wade does not contend that his image was somehow obscured in such a way that the jurors would not recognize him. In this context, the allegedly improper testimony does not undermine confidence in Wade's convictions or sentences.

Next, Wade argues that Detective Meacham gave improper opinion testimony regarding duct tape found at the gravesite. Detective Meacham was

- 32 -

asked if the tape taken from the gravesite was "the same Office Depot duct tape that was purchased, at least the same type of tape," and he answered, "[y]es." In context, Detective Meacham's testimony is best interpreted as expressing the opinion that the duct tape found at the gravesite was the same "type of tape" as was purchased from Office Depot, not as expressing an opinion that the duct tape was from the particular roll purchased by Cole.

This opinion that the two tape samples were the same type of tape, is a permissible lay opinion under section 90.701, Florida Statutes (2007). In Reynolds v. State, 99 So. 3d 459, 479 (Fla. 2012), cert. denied, 133 S. Ct. 1633 (2013), this Court concluded that a lay person could offer an opinion regarding whether clothing appeared to be bleached because that observation "would be within the knowledge of an average person who has washed and bleached clothing" and the testimony at issue "was not a chemical analysis." The observation that a piece of tape is or is not duct tape is similarly within the knowledge of an average person. Accordingly, trial counsel did not err by not objecting to Detective Meacham's testimony.

Also in this claim, Wade contends that trial counsel should have objected to Officer Rowan's testimony about the keys found in Wade's hotel room. Wade asserts that Officer Rowan opined that the keys belonged to the Sumners. The record refutes this claim. When asked to describe "any property [found in room

302] that appeared to be relevant from the information you had to the abduction of Reggie and Carol Sumner," Officer Rowan explained why he suspected that the keys were for the Sumners' Lincoln, but he did not actually opine that they were. Officer Rowan presented facts to the jury and allowed the jurors to reach their own conclusion.

### c. United States Marshal Alred's Testimony

Finally, Wade argues that trial counsel should have objected to Marshal Alred's testimony on the basis of hearsay and improper opinion. Wade contends that the postconviction court erred in determining that the cell phone data interpreted by Marshal Alred was not hearsay and that Marshal Alred was qualified as someone with particular expertise to use cell phone data to testify about the location from which calls were placed. This Court's precedent and the record support the postconviction court's denial of relief.

Marshal Alred testified that in July 2005, he assisted the Jacksonville Sheriff's Office in their search for the Sumners or, if the Sumners were no longer alive, the individuals who kidnapped them. Marshal Alred explained that as part of that investigation, he requested records from Nextel Telephone Company regarding a cell phone that was registered to David Jackson, who was later determined to be Michael Jackson using an alias. Based on that information, Marshal Alred testified that on July 8, 2005, three calls were made to or from

Jackson's phone using side one of the San Marco tower, and then shortly after midnight on July 9, 2005, a call was made from Jackson's phone to the Heritage Credit Union, using the Macclenny tower.

First, trial counsel did not act unreasonably by failing to raise a hearsay objection to this testimony. As recognized by the Eleventh Circuit Court of Appeals in United States v. Lamons, 532 F.3d 1251 (11th Cir. 2008), phone company call lists are not out-of-court statements by a declarant. The Eleventh Circuit reasoned:

> We have no difficulty concluding that the statements in question are the statements of machines, not statements of persons. . . . [T]he relevant point is that no human intervened at the time the raw billing data was "stated" by the machine—that is, recorded onto Sprint's data reels. The process by which the data was extracted from the reels and placed onto compact CDs such as Exhibit 2 was similarly fully automated. Finally, Burden did not alter the underlying data on Exhibit 2 when she created a printout of calls made to AirTran's corporate telephone number on September 18, 2001 (Exhibit 3); she merely utilized Fonview in pre-programmed fashion to read the encrypted data on Exhibit 2 and to format the data so as to indicate the relevant portion.

Id. at 1263-64 (footnotes omitted); see also Bowe v. State, 785 So. 2d 531, 532 (Fla. 4th DCA 2001) ("[N]either the pager nor the caller I.D. screen, like a radar or other similar machine able to give a readout, was a 'person' capable of being a 'declarant' within the definition of the hearsay rule." (quoting § 90.801(1)(b), Fla. Stat. (2000))). In light of these authorities, trial counsel did not err by not raising a hearsay objection to the testimony about the content of the Nextel records.

Second, trial counsel did not have a basis to object to Marshal Alred's qualifications to interpret the records. This Court has held that non-experts may testify about cell phone records. See Gordon v. State, 863 So. 2d 1215, 1219 (Fla. 2003) (determining that a witness's testimony about the content of phone records and the locations of the calls "did not constitute expert testimony" requiring "technical, or other specialized knowledge").

## B. INEFFECTIVE ASSISTANCE DURING THE PENALTY PHASE

### 1. Presentation of Mitigating Evidence

#### a. Mental Health Expert

Wade argues that his trial counsel was ineffective for not ensuring that Wade received a reasonably competent mental health evaluation and for not calling a mental health expert to testify generally about the adolescent brain. The postconviction court concluded that trial counsel was not deficient, reasoning that it was Wade's own behavior that prevented trial counsel from presenting mental health mitigation. The postconviction court also denied relief on the basis that Wade did not prove that he was prejudiced by any alleged errors. The postconviction court concluded that the defense expert presented at the evidentiary hearing, Dr. Hyman Eisenstein, was not credible and that any expert testimony about impulsiveness would not be consistent with the facts of the crimes. The

postconviction court did not err in denying relief. Wade proved neither deficiency nor prejudice.

"[T]he inquiry regarding ineffective assistance and mitigation should focus on whether trial counsel's decision was reasonable at the time the decision was made, without the benefit of hindsight." Henry v. State, 937 So. 2d 563, 573 (Fla. 2006). In Spann v. State, 985 So. 2d 1059, 1070 (Fla. 2008), this Court concluded that trial counsel could not be deemed ineffective for failing to obtain a complete mental health evaluation of the defendant when the defendant "thwarted counsel's efforts to seek mental health mitigation." In that case, trial counsel hired a mental health expert who attempted to meet with Spann on two occasions. Spann was cooperative at the first visit but then, on the second visit, refused to complete the evaluation, despite the expert's explanation of the importance of Spann's cooperation. Id.

In this case, the record demonstrates that trial counsel made a reasonable effort to have Wade evaluated by a mental health expert and that Wade refused to cooperate. At the evidentiary hearing, attorney Tassone testified that he hired Dr. Stephen I. Bloomfield to evaluate Wade for mental health mitigation and that Dr. Bloomfield reported back that Wade was "not cooperative with him" and "did not open up." Tassone stated that he explained to Wade the importance of being

forthcoming with the psychologist, but Wade responded that "he had given the information that he wanted to give."

Dr. Bloomfield, a psychologist, testified that he was hired in June or July of 2006 to work on Wade's case and that during a meeting at attorney Tassone's office, Dr. Bloomfield reviewed records pertaining to Wade. Dr. Bloomfield described his first meeting with Wade as a normal first meeting, except that Wade was focused on his dissatisfaction with his attorneys and his desire to see the discovery in his case. According to Dr. Bloomfield, at the second meeting, Wade "didn't want to go forward with much because he was pretty insistent on getting information from counsel, not from me." Dr. Bloomfield testified that he was able to get some background information from Wade at the third meeting, although Wade was still reluctant. Wade told the doctor about when he was involuntarily committed as a teenager, his use of cocaine and marijuana, his employment history, and his general education diploma. Wade submitted to some competency testing but would not participate in psychological testing. Dr. Bloomfield explained that Wade was "cordial and pleasant but he wouldn't do psychological testing. I offered and I told him I thought it was important. . . . But he didn't want to do it."

Dr. Bloomfield opined that Wade understood the purpose of the meetings and made a knowing, intelligent, and voluntary decision not to participate in

developing mental health mitigation. Additionally, Dr. Bloomfield testified that he reported to Tassone that because Wade was "reluctant" and unwilling to participate in psychological testing, Dr. Bloomfield "didn't have at that point anything that [he] could testify to."

Based on the foregoing, the postconviction court correctly concluded that trial counsel cannot be considered deficient for failing to obtain a full mental health evaluation. The lack of evaluation was a result of Wade's refusal to submit to an evaluation, not trial counsel's lack of competency.

Wade also failed to establish that he was prejudiced by his counsel's inability to obtain a mental health evaluation of Wade.

First, Dr. Eisenstein did not testify that his postconviction evaluation of Wade—which included neuropsychological testing and an interview—uncovered any significant mental illness or dysfunction. Dr. Eisenstein concluded that Wade is in the normal range of intelligence but that Wade's "brain does not process information as quickly as he should be able to do." Dr. Eisenstein explained that while Wade's score on the perceptional subtest of the Wechsler Adult Intelligence Scale-Fourth Edition (WAIS-IV) was in the high average range, Wade's score on the verbal subtest was only in the average range. Similarly, there was a discrepancy between Wade's visual learning, which was in the high normal range, and his verbal learning, which was in the borderline range on the Wechsler

- 39 -

Memory Scale. A third test revealed that Wade has trouble with brain variability, meaning he has difficulty focusing and regulating his impulses.

Dr. Eisenstein testified that these discrepancies in Wade's brain functioning are consistent with a diagnosis of brain damage but do not for certain indicate brain damage. Dr. Eisenstein also explained that the discrepancies could be a result of the cumulative effect of Wade's drug use and oxygen deprivation from playing a game where Wade and his friends would choke each other to unconsciousness or that those incidents could have "exacerbated an underlying condition."

Despite Dr. Eisenstein's opinion that Wade may have brain damage, Wade did not introduce any evidence of a PET or other brain scan that could have confirmed the suspicion of brain damage. Moreover, Dr. Eisenstein opined that Wade "certainly has enough strengths and abilities that he could have been a productive, law-abiding individual that could have been independent and very happy and productive in society."

Second, the record supports the postconviction court's conclusion that Dr. Eisenstein's opinions about Wade's mental and emotional state at the time of the crimes were not credible. Dr. Eisenstein opined that at the time of the crimes, Wade was experiencing stress from brain impairment, longstanding attention deficit disorder, academic failure, feelings of abandonment, lack of stability, depression, and drug use, which cumulatively established the statutory mitigating

circumstances that Wade was suffering from extreme mental or emotional distress and that his capacity to conform his conduct to the requirements of the law was substantially impaired. In addition, Dr. Eisenstein testified that he thought the statutory mitigating factor of substantial domination was applicable. Dr. Eisenstein concluded that due to the lack of a father figure in Wade's life and his impulsiveness, Wade was "extremely vulnerable" to being dominated by Jackson.

Despite giving these opinions about Wade's mental and emotional state at the time of the crimes, Dr. Eisenstein did not offer any explanation of why the long-term stressors identified above would have reached an extreme level at the time of the robberies, kidnappings, and murders. Dr. Eisenstein also admitted on cross-examination that he did not discuss the crimes with Wade and he did not review the guilt phase testimony, the police reports related to the crimes, Wade's statements to law enforcement officers, or the evidence presented at the codefendants' trials. Dr. Eisenstein further testified that Wade never expressed to him that Wade acted at the behest of Jackson, and Wade had committed crimes before he ever met Jackson. Dr. Eisenstein's lack of familiarity with the circumstances of the crimes and his lack of specific reasoning for his opinions support the postconviction court's conclusion that Dr. Eisenstein's testimony about the statutory mitigating factors was not entitled to belief.

In the second part of this claim, Wade argues that even if trial counsel was not deficient for failing to obtain a mental health expert's evaluation of Wade, trial counsel erred by not calling Dr. Bloomfield or a similar expert to testify generally about young adult brain development. Because Wade turned eighteen shortly before the crimes, Wade asserts that such testimony would have been compelling mitigation. On this point, trial counsel made a reasonable, strategic decision to not call Dr. Bloomfield or another expert.

At the evidentiary hearing, attorney Tassone explained that he knew at the time of Wade's trial that due to the incomplete development of their brains, juveniles have difficulty with decision-making and impulsivity. Tassone testified that he was concerned, however, that presenting such evidence would be more harmful than helpful to Wade's defense. Tassone reasoned that the State would have "some pertinent questions maybe in cross[-examination] of that expert." He explained:

> What I was concerned about was the issue of impulsivity on a crime that spanned 24 or 36 or 48 hours because the planning of this, the act itself wasn't just a five-minute or one-hour event, so impulsivity to me I didn't—the last thing I needed was the [S]tate to beat [an expert] over the head with what are you saying, that [Wade's] brain wasn't developed and it was impulsive, then he had impulses for 36 or 48 hours or whatever the number of hours may be.

"Trial counsel is not deficient where he makes a reasonable strategic decision to not present mental mitigation testimony during the penalty phase

because it could open the door to other damaging testimony." Winkles v. State, 21 So. 3d 19, 26 (Fla. 2009) (quoting Griffin v. State, 866 So. 2d 1, 9 (Fla. 2003)). In this case, expert testimony about impulsiveness and decision-making in juveniles would have allowed the State to emphasize the protracted nature of the crimes against the Sumners and point out how many opportunities Wade had to disentangle himself from the plan instigated by Jackson and Cole.

Moreover, Dr. Eisenstein's evidentiary hearing testimony did not call into question the reasonableness of attorney Tassone's decision not to call a mental health expert to testify about the juvenile brain. On direct examination, Dr. Eisenstein explained that due to the incomplete development of the executive functioning portions of the brain, individuals at age eighteen generally have difficulty inhibiting their responses, weighing options, and processing complex information. On cross-examination, however, the State asked Dr. Eisenstein if he was aware that Wade and his codefendants contemplated the robberies and murders for days or weeks beforehand and that the Sumners' grave was dug at least forty-eight hours before it was used. Dr. Eisenstein answered, "[p]erhaps." When then asked if a young person's "decision to act after all of that time has passed is not a rash decision," Dr. Eisenstein answered, "[i]n terms of time, correct." When invited by the defense to elaborate, Dr. Eisenstein testified:

> [O]ne can't equate just because time has passed that therefore the judgment or the reasoning processes have—are in place to make a

contemplated decision, a rational decision in terms of inhibiting a response or regulating a response. Time is not—is not the same thing equated here as a thinking process, so there's no way to know that thinking processes were rational and the ability to judge and to process that information. That's—you can't equate the two.

As attorney Tassone anticipated, the cross-examination of Dr. Eisenstein made the expert appear evasive. Moreover, Dr. Eisenstein's attempt to testify about the juvenile brain demonstrated that such testimony would have highlighted the fact that—without the benefit of a psychological evaluation of Wade—a mental health expert could not actually provide the jury with insight about Wade's thinking processes at the time of the crimes.

### b. Intoxication at Time of Crimes

Wade argues that defense counsel was ineffective for not calling Carmen Massanet and Nixon to testify about Wade's drug and alcohol use at the time of the crimes. The postconviction court concluded that Massanet would not have been a helpful witness and Nixon's testimony at the evidentiary hearing was not credible. Again, the postconviction court did not err.

The record supports the trial court's conclusion that Massanet would not have been a helpful witness. In an October 16, 2007, letter from private investigator Michael Hurst to attorney Eler, Hurst summarized his investigative interview with Massanet. Hurst wrote that Massanet agreed that she had a relationship with Jackson and with Wade. Massanet answered "yes" when asked if

- 44 -

she heard of an incident in which Jackson pointed a gun at Wade. Massanet added, however, that she heard this story from both Jackson and Wade "but doesn't know whether to believe it or not because they were friends and might have just told her that." According to Hurst, Massanet stated that she "never saw [Jackson] or [Wade] with a gun;" "she didn't want anything to do with either one of them . . . and that they were both liars;" and she was "scared of [Jackson]." Wade's postconviction counsel was unable to secure Massanet's attendance at the evidentiary hearing.

Given this record, the postconviction court did not err in concluding that Massanet would not be a helpful witness. There is no record support for Wade's allegation that Massanet had knowledge of Wade's drug and alcohol use near the time of the crimes. Moreover, while Massanet likely would have testified that she was frightened of Jackson, she also had a negative opinion of Wade and expressed doubt about whether Jackson had actually threatened Wade. "[A]n attorney's reasoned decision not to present evidence of dubious mitigating value does not constitute ineffective assistance." Gore v. State, 846 So. 2d 461, 470 (Fla. 2003).

Turning to Nixon, "[s]o long as its decisions are supported by competent, substantial evidence, this Court will not substitute its judgment for that of the trial court on questions of fact and, likewise, on the credibility of the witnesses and the weight to be given to the evidence by the trial court." Windom v. State, 886 So. 2d

- 45 -

915, 921 (Fla. 2004) (quoting <u>Porter v. State</u>, 788 So. 2d 917, 923 (Fla. 2001)).

Here, the postconviction court's conclusion that Nixon's evidentiary hearing testimony was not credible, is entitled to deference.

Nixon's evidentiary hearing testimony contradicted his trial testimony. At the evidentiary hearing, Nixon testified that during the two- or three-day period in which the group robbed, kidnapped, and murdered the Sumners, Wade was "messed up the whole time" on cocaine, alcohol, and "pills." Nixon also stated that the group was smoking, by which it appears that he meant marijuana, not tobacco. In contrast, at Wade's trial, the trial court asked Nixon a question drafted by the jury: "Regarding drugs and or alcohol, were drugs and or alcohol involved prior to the robbery or kidnapping?" Nixon answered: "We smoked weed and we drank Lord Calvert."

Wade's argument for why this Court should reject the postconviction court's credibility determination is that no questions were posed to Nixon during Wade's trial that asked specifically about Wade's drug use. While the intended subject of the jury's question was ambiguous, Wade ignores that Nixon's answer was about the group's use of drugs and alcohol, not solely his own use. Nixon testified that "[<u>w</u>]e smoked weed and <u>we</u> drank Lord Calvert." (Emphasis added.) Nixon's testimonies were inconsistent, and thus, the record supports the postconviction court's conclusion that Nixon's postconviction testimony was not entitled to belief.

### c. Other Mitigation Evidence

Wade asserts that the postconviction court erred in denying his claim that trial counsel was ineffective for not investigating mitigation leads identified by the defense's mitigation specialist. Specifically, Wade contends that trial counsel erred by failing to call penalty phase witnesses who could have presented evidence that Wade: (1) once threatened to commit suicide; (2) suffered from depression, low self-esteem, stagnated development, and head trauma; (3) suffered from parental abandonment and neglect and had a dysfunctional family; (4) lacked a male role model; (5) came from a family with a history of Asperger's syndrome, mental disorders, and drug use; and (6) had a history of drug and alcohol abuse and was intoxicated at the time of the crimes.

Most of the potentially mitigating factors that Wade contends were overlooked were explored at the penalty phase. Wade's penalty phase was not one in which trial counsel presented only a meager amount of mitigating evidence. Rather, Wade's trial counsel called Wade's mother, Wade's half-sister, a childhood friend's mother, the assistant principal of Wade's middle school, Wade's youth pastor, and Nixon as penalty phase witnesses. Through these witness, trial counsel gave the jury a detailed account of Wade's life beginning from the time of his parents' divorce when Wade was around eight years old.

Wade is correct that no evidence was presented to show that Wade may have suffered a head trauma from playing a choking game; Wade's mother may have suffered from bipolar disorder; Wade's father suffered from depression; two members of Wade's family were diagnosed with Asperger's syndrome; Wade's half-brother was addicted to crack and heroin; and another brother suffered from a suspected chemical imbalance. But these few pieces of noncumulative mitigating evidence presented at the evidentiary hearing—even if considered in conjunction with Dr. Eisenstein's testimony that Wade might have brain damage—are not so significant as to undermine confidence in Wade's death sentences.

As for the possibility of a head trauma from the choking game, Nixon and Wade's childhood friend, Vanessa Wilkinson, each testified that they had played the game with Wade on numerous occasions. Neither witness, however, expressed that he or she experienced any known brain injury as a result of the game. In addition, Dr. Eisenstein found no conclusive proof that Wade suffered from brain damage and testified that although any oxygen deprivation hinders the normal development of the brain, the choking game is "mild in terms of a spectrum head injury." Thus, Wade did not demonstrate that he suffers from brain damage that could have been presented to the jury as a mitigating circumstance.

As for Wade's family history, Wade has not demonstrated that at the time of his trial, any of his family members had been diagnosed with Asperger's

syndrome. While neither witness mentioned Asperger's syndrome during their penalty phase testimony, Wade's mother testified at the evidentiary hearing that two members of the family—Wade's brother and Wade's niece—were recently diagnosed with Asperger's syndrome, and Wade's half-sister similarly testified about her young daughter's diagnosis. Still, neither witness addressed whether those diagnoses were made before or after Wade's 2007 trial. "Trial counsel cannot be ineffective for failing to present evidence that did not exist at the time of trial." Clark v. State, 35 So. 3d 880, 888 (Fla. 2010).

Trial counsel did have reason to know at the time of the trial that Wade's mother was suspected of being bipolar, Wade's father was depressed, Wade's half-brother Robert had been addicted to crack and heroin, and that his brother Andrew was thought to have a "chemical imbalance." This information was included in a report drafted by Shreya Mandal, who was hired by trial counsel as a mitigation specialist. Trial counsel did not present evidence of the mental health history of Wade's family at the penalty phase.

Nevertheless, while defense counsel could have presented evidence about the mental health of Wade's relatives, Wade has not shown that this evidence would have been material. At the penalty phase, the trial court and jury heard evidence that Wade was raised by absentee parents—including a mother who frequently kicked him out of the family home beginning at the age of fourteen.

The jury was also informed that Wade was emotionally scarred by his father's absence, once threatened to commit suicide, and abused drugs and alcohol to the extent that he once went to a rehabilitation center. Based on this evidence, the trial court found and gave weight to the statutory mitigating factor that Wade's capacity was substantially impaired and several nonstatutory mitigating factors relating to Wade's difficult childhood, substance abuse, and mental health. See Wade, 41 So. 3d at 866. As a result, the previously unpresented evidence about the possibility of brain damage or about the mental health of Wade's family members would not have proven a new mitigating factor but, at most, would have led to slightly more weight being given to the mitigating factors that were considered by the jury and found by the trial court.

This possibility that additional weight would have been given to the mitigating factors does not undermine confidence in Wade's death sentences. Despite giving "great weight" to the factor of Wade's age at the time of the offense, id., and varying weight to numerous mitigating factors pertaining to Wade's background and mental status—both historically and at the time of the crimes—the trial court concluded that the seven aggravating factors applicable to each murder far outweighed the mitigating circumstances, id. at 867. Given this overwhelming amount of aggravation, more information about Wade's background would not have tipped the scale in favor of life sentences.

## 2. Concession of Aggravating Factors

### a. Pecuniary Gain

Wade contends that his trial counsel erred by conceding the aggravating factor that the murders were committed for pecuniary gain. Trial counsel did not err but instead made a reasonable, strategic decision to concede that aggravating factor.

During his penalty phase closing argument, attorney Tassone conceded that Wade was convicted of the murders and that Wade was motivated by greed. He argued: "There was no good reason to murder Reggie and Carol Sumner and [Wade] only did it to get money and indeed greed is the reason that Reggie and Carol Sumner are dead and greed is the reason that Alan Wade sits here today."

At the evidentiary hearing, Tassone testified that he made a strategic decision to concede the pecuniary gain aggravating factor. Attorney Tassone explained that he felt that pecuniary gain as a motive was proven by the evidence and that—in light of the jury's decision to convict Wade of robbery—conceding the factor would be a method of maintaining some credibility with the jury. Tassone summarized: "I'm not clever enough . . . to figure out how to argue that it wasn't pecuniary gain on a robbery conviction."

This Court's precedent demonstrates that attorney Tassone's strategic decision was reasonable. In a similar case where the codefendants stole the

victim's car and wallet, this Court agreed with the postconviction court's conclusion that " 'it would have been preposterous' for penalty-phase defense counsel to argue that no facts in the record established pecuniary gain when the jury found, beyond a reasonable doubt," that the defendant was "guilty of conspiracy to commit armed robbery, armed robbery, and murder in the first degree." Gamble v. State, 877 So. 2d 706, 716 (Fla. 2004).

### b. HAC

Wade contends that trial counsel conceded the aggravating circumstance of HAC when he argued: "I suggest to you that Alan Wade's acts were evil itself, that there was no moral justification for the acts of anyone that was in that group." Trial counsel's closing argument can be reasonably interpreted as conceding HAC, but any such concession did not prejudice Wade. The evidence established that the victims were buried alive, and Wade offers no explanation of how trial counsel could have coherently argued to the jury that the murders were not "conscienceless or pitiless and unnecessarily torturous to the victim." Diaz v. State, 860 So. 2d 960, 966 (Fla. 2003) (quoting State v. Dixon, 283 So. 2d 1, 9 (Fla. 1973)). In light of the jury's guilt phase decision to convict Wade of the murders and the evidence that the Sumners experienced torturous deaths, any inadvertent concession by trial counsel does not undermine confidence in the applicability of the HAC aggravating factor.

### C. INEFFECTIVE ASSISTANCE DURING VOIR DIRE

In his final claim on appeal, Wade argues that the postconviction court should have concluded that Wade's trial counsel performed ineffectively during voir dire. Wade's arguments are without merit.

### 1. Misstatement of Florida Law

Wade contends that trial counsel was ineffective for misleading the prospective jurors during voir dire by creating the impression that if the aggravating factors outweighed the mitigating factors, the jurors would have to recommend the death penalty. Wade did not prove that he was prejudiced by trial counsel's allegedly improper comments.

The jurors in a capital case should not be told that if they conclude that the aggravating factors outweigh the mitigating factors, then the law requires them to recommend a death sentence. Such a comment is a "misstatement[] of law because 'a jury is neither compelled nor required to recommend death where aggravating factors outweigh mitigating factors.' " Franqui v. State, 804 So. 2d 1185, 1192 (Fla. 2001) (quoting Henyard v. State, 689 So. 2d 239, 249-50 (Fla. 1996)).

Regarding prospective juror Green, Wade has not demonstrated any error. After prospective juror Green stated that she had feelings against the death penalty, defense counsel attempted to rehabilitate her. Defense counsel asked Ms. Green several questions, including: "I take it then that you could if the aggravating

circumstances outweighed the mitigating circumstances apply the law and if the case were appropriate vote death?" Defense counsel's question did not misstate the law. Defense counsel did not state or imply that a death vote is required where the aggravating circumstances outweigh the mitigating circumstances but only that in such a circumstance, the death penalty may be appropriate. See Davis v. State, 136 So. 3d 1169, 1207 (Fla. 2014) ("[T]he prosecutor correctly informed the jury that a death sentence is legally permitted where the aggravating circumstances outweigh the mitigating circumstances without improperly diminishing the jury's discretion to recommend less than the legally allowable sentence.").

Regarding prospective juror Butler, when being interviewed by the State, Ms. Butler gave answers suggesting that she would hold the State to a higher burden of proof in a death penalty case and, when asked by the defense, indicated that her support for the death penalty was at a level two out of five. In an effort to avoid juror Butler being struck for cause on the basis that she could not vote for the death penalty, trial counsel asked her: "[I]f [the State] presented aggravation, factors that beyond a reasonable doubt outweighed the mitigators, then you could apply the law and follow the law and vote death, is that right?" Defense counsel's question to Ms. Butler—while not expressly stating that the jurors would be required to vote for death if the aggravating factors outweighed the mitigating

factors—could have caused a lay person to equate "follow the law" and "vote death."

But even if defense counsel's question to Ms. Butler was improper, Wade cannot demonstrate prejudice. This Court has concluded that a misstatement during voir dire about the weighing of aggravating and mitigating factors does not satisfy the Strickland prejudice prong where the jury is properly instructed on the issue by the trial court. See, e.g., Krawczuk v. State, 92 So. 3d 195, 207 (Fla. 2012) ("As noted by the postconviction court, the record indicates that the jury was properly instructed. Accordingly, we find that Krawczuk has not demonstrated prejudice."); Anderson v. State, 18 So. 3d 501, 517-18 (Fla. 2009) (similar). In the instant case, the trial court properly instructed the jury: "If one or more aggravating circumstances are established you should consider all of the evidence tending to establish one or more mitigating circumstances and give that evidence such weight as you feel it should receive in reaching your conclusion as to the sentence that should be imposed." As a result, Wade has not demonstrated prejudice.

## 2. Failure to Preserve Issue for Appeal

Wade argues that the postconviction court should have concluded that trial counsel was ineffective because trial counsel failed to properly preserve for review the trial court's denial of two challenges for cause made by the defense. Wade contends that trial counsel erred by not identifying a juror whom he would have

stricken if granted additional peremptory challenges. This claim of ineffectiveness of counsel is insufficiently pleaded. Wade does not allege which juror trial counsel should have identified as being objectionable.

### 3. Questioning of Jurors and Juror Challenges

In his final claim on appeal, Wade argues that the postconviction court should have concluded that trial counsel was ineffective for failing to adequately explore the feelings about the death penalty of four members of the jury—jurors Isleib, Baesler, Smith, and Bragg—and for failing to challenge for cause or use a peremptory challenge to remove those jurors. Wade is not entitled to relief.

Wade's claim that "there would have been a basis for a for cause challenge if counsel had followed up during voir dire with more specific questions is speculative." Green v. State, 975 So. 2d 1090, 1105 (Fla. 2008). Wade offers no reason to believe that if the jurors were asked in more detail about the relative burdens of proof and the weighing process, they would have given answers that raised doubt about their fitness to serve.

Wade also fails to establish that trial counsel was ineffective for not challenging for cause or using a peremptory strike to remove jurors Isleib, Baesler, Smith, and Bragg. As set out in Carratelli v. State, 961 So. 2d 312, 324-25 (Fla. 2007), where a defendant "alleges that trial counsel was ineffective for failing to raise or preserve a cause challenge, the defendant must demonstrate that a juror

was actually biased." "Under the actual bias standard, the defendant must demonstrate that the juror in question was not impartial—i.e., that the juror was biased against the defendant, and the evidence of bias must be plain on the face of the record." Id. at 324. Wade cited to no evidence on the face of the record that indicates that any of the above listed jurors were actually biased against him. Each of the four jurors stated that, in general, on a scale of one to five—five being the most in favor of the death penalty as a potential punishment for first-degree murder—they supported the death penalty at a level five. But despite identifying themselves as level-fives, each juror expressed a willingness to make an individualized sentencing recommendation.

### III. CONCLUSION

For the reasons stated above, we affirm the postconviction court's order denying Wade's motion for postconviction relief.

It is so ordered.

LABARGA, C.J., and PARIENTE, LEWIS, QUINCE, POLSTON, and PERRY, JJ., concur.
CANADY, J., recused.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION, AND IF FILED, DETERMINED.

An Appeal from the Circuit Court in and for Duval County,
    Michael R. Weatherby, Judge - Case No. 162005CF010263BXXXMA

Ann Elizabeth Finnell of Finnell, McGuinness, Nezami, & Andux, P.A., Jacksonville, Florida,

for Appellant

Pamela Jo Bondi, Attorney General and Carolyn Marie Snurkowski, Associate Deputy Attorney General, Tallahassee, Florida,

for Appellee